SEATTLE AUDUBON SOCIETY,
et al., Plaintiffs–Appellants,

v.

John L. EVANS, in his official capacity
as Chief, U.S. Forest Service, et al.,
Defendants–Appellees.

SEATTLE AUDUBON SOCIETY,
et al., Plaintiffs–Appellees,

v.

UNITED STATES FOREST SERVICE,
Defendant–Appellant,

and

Washington Contract Loggers
Association, Defendants–
Intervenors–Appellees.

SEATTLE AUDUBON SOCIETY,
Plaintiff–Appellee,

v.

John L. EVANS, in his official capacity
as Chief, U.S. Forest Service,
Defendant,

and

Washington Contract Loggers As-
sociation, et al., Defendants–
Intervenors–Appellants.

PORTLAND AUDUBON SOCIETY,
Plaintiff–Appellant,

v.

Manuel LUJAN, Jr., in his official
capacity as Secretary of Interior,
Defendant–Appellee,

and

Northwest Forest Resource Council,
et al., Defendants–Intervenors–
Appellees. (Two Cases)

Nos. 91–35528, 91–35529, 91–35563, 91–
35782, 91–35802 and 91–35992.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 28, 1991.

Decided Dec. 23, 1991.

Michael D. Axline, Western Environmental Law Clinic, Eugene, Oregon and Victor M. Sher, Sierra Club Legal Defense Fund, Seattle, Wash., for Seattle Audubon Society, et al.

Anne S. Almy, Thomas Lee, and Louise F. Milkman, U.S. Dept. of Justice, Washington, D.C., for U.S. Forest Service, et al. and Secretary, U.S. Dept. of Interior.

Mark C. Rutzick and Cynthia L. Hull, Preston, Thorgrimson, Shidler, Gates and Ellis, Portland, Or., for Washington Contract Loggers Ass'n, et al.

Phillip D. Chadsey and Kevin Q. Davis, Stoel, Rives, Boley, Jones & Grey, Portland, Or., for The Ass'n of O & C Counties and Benton County.

Before GOODWIN, SCHROEDER and PREGERSON, Circuit Judges.

SCHROEDER, Circuit Judge:

These appeals all arise out of litigation instituted by the Portland Audubon Society (PAS) and the Seattle Audubon Society (SAS) challenging logging in old-growth national forests as violative of several federal statutes.

In appeal nos. 91–35529 and 91–35563, the defendant United States Forest Service and intervenor-defendant Washington Contract Loggers Association (WCLA), appeal from an injunction entered by the district court in Seattle requiring the Forest Service to put into effect revised standards and guidelines to ensure the viability of the northern spotted owl and enjoining, in the meantime, timber sales in spotted owl habitat in national forests in Washington, Oregon and Northern California. The district court held such planning was required under the National Forest Management Act and regulations promulgated pursuant to it that require Forest Service planning to ensure the viability of vertebrate and non-vertebrate species. See 16 U.S.C. §§ 1600–1687 (1985) ("NFMA"); 36 C.F.R. § 219.19.

In its appeal, the Forest Service's principal contention is that it is no longer required under the NFMA to plan for the future survival of the spotted owl because the Fish and Wildlife Service has declared the owl threatened under the Endangered Species Act, 16 U.S.C. §§ 1531–1543 (1985) ("ESA"). The Forest Service contends that it is required to plan for "viable" species, and that a species declared threatened or endangered under the ESA is no longer viable.

The district court held that the listing under the Endangered Species Act triggered new obligations under that Act but did not reduce the planning obligations of the Forest Service under the NFMA. We agree with the district court that the government's position in this case is inconsistent with the language of the key regulation, the purpose of the applicable statutes and with the position the Forest Service itself has taken in other contexts.

WCLA's appeal in principal part challenges some of the district court's findings which the government does not dispute. We hold they are not clearly erroneous.

The district court's Memorandum Decision and Injunction entered May 23, 1991 are published at 771 F.Supp. 1081 (1991) and contain extensive findings. We affirm the district court's injunction and incorporate by reference into this Opinion the district court's Memorandum Decision.

While the district court in Seattle granted an injunction pursuant to the NFMA, the district courts in both Seattle and Port-

land rejected plaintiffs' claim that the logging of old-growth timber, that adversely affects owl habitat, constitutes a violation of the Migratory Bird Treaty Act, 16 U.S.C. §§ 703–711 (1985) ("MBTA"). In appeal nos. 91–35528 and 91–35782, the Seattle Audubon Society and the Portland Audubon Society appeal those rulings denying injunctive relief based on the MBTA. We affirm in those appeals as well.

In consolidated appeal nos. 91–35802 and 91–35992 the Portland Audubon Society appeals the district court's ruling denying it permission to reallege the NEPA claim we held was barred in *Portland Audubon Soc'y v. Lujan*, 884 F.2d 1233 (9th Cir. 1989), *cert. denied*, 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990). We hereby reverse that ruling.

1. Section 219.19 provides:
Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.
(a) Each alternative shall establish objectives for the maintenance and improvement of habitat for management indicator species selected under paragraph (g)(1) of this section, to the degree consistent with overall multiple use objectives of the alternative. To meet this goal, management planning for the fish and wildlife resource shall meet the requirements set forth in paragraphs (a)(1) through (a)(7) of this section.
(1) In order to estimate the effects of each alternative on fish and wildlife populations, certain vertebrate and/or invertebrate species present in the area shall be identified and selected as management indicator species and the reasons for their selection will be stated. These species shall be selected because their population changes are believed to indicate the effects of management activities. In the selection of management indicator species, the following categories shall be represented where appropriate: Endangered and threatened plant and animal species identified on State and Federal lists for the planning area; species with special habitat needs that may be

## I. APPLICABILITY OF THE VIABILITY REQUIREMENTS UNDER NFMA: THE FOREST SERVICE'S APPEAL

### A. Background

The NFMA requires the Forest Service to prepare management plans for its national forests to meet the multiple-use objectives of the national forest system. 16 U.S.C. § 1604(a)-(m). In keeping with the statute's mandate, the Forest Service is required to promulgate regulations that will define how the management plans are to provide for a diversity of plant and animal communities. *Id.* § 1604(g)(3)(B). The Forest Service responded by promulgating the regulation at issue in the Forest Service and WCLA appeals. *See* 36 C.F.R. § 219.19.[1] There are at least three major

influenced significantly by planned management programs; species commonly hunted, fished, or trapped; non-game species of special interest; and additional plant or animal species selected because their population changes are believed to indicate the effects of management activities on other species of selected major biological communities or on water quality. On the basis of available scientific information, the interdisciplinary team shall estimate the effects of changes in vegetation type, timber age classes, community composition, rotation age, and year-long suitability of habitat related to mobility of management indicator species. Where appropriate, measures to mitigate adverse effects shall be prescribed.
(2) Planning alternatives shall be stated and evaluated in terms of both amount and quality of habitat and of animal population trends of the management indicator species.
(3) Biologists from State fish and wildlife agencies and other Federal agencies shall be consulted in order to coordinate planning for fish and wildlife, including opportunities for the reintroduction of extirpated species.
(4) Access and dispersal problems of hunting, fishing, and other visitor uses shall be considered.
(5) The effects of pest and fire management on fish and wildlife populations shall be considered.
(6) Population trends of the management indicator species will be monitored and relationships to habitat changes determined. This monitoring will be done in cooperation with State fish and wildlife agencies, to the extent practicable.
(7) Habitat determined to be critical for threatened and endangered species shall be

components to this regulation. First, the regulation establishes as its purpose management of the forest to maintain a "viable population" of existing species. *Id.* Second, the Forest Service must select "indicator species" for the purpose of evaluating wildlife decisions. *Id.* § 219.19(a)(1)–(6). For these species, forest plans "shall establish objectives for the maintenance and improvement of habitat ... to the degree consistent with overall multiple use objectives...." *Id.* § 219.19(a). Threatened and endangered species may be selected as indicators "where appropriate." *Id.* § 219.19(a)(1). A third part of this regulation requires the Forest Service to identify habitats critical to threatened or endangered species and prescribe measures to prevent their adverse modification. *Id.* § 219.19(a)(7). The Forest Service is also required to determine objectives for appropriate conservation measures for threatened or endangered species. *Id.*

In 1988, the Forest Service issued a record of decision (ROD) to amend its regional guide for the Pacific Northwest. Pursuant to NFMA requirements, these amendments specified standards and guidelines to provide for the viability of the northern spotted owl. In 1989, SAS filed suit against the Forest Service challenging the 1988 ROD. SAS alleged that the regional guide's standards and guidelines would not maintain viable populations of the owl.

On June 22, 1990, the Fish and Wildlife Service ("FWS") listed the owl as a threatened species throughout its range. The Forest Service then vacated the standards and guidelines in the regional guide and revoked the 1988 ROD. 55 Fed.Reg. 40412 (October 3, 1990). The Forest Service announced that "[a]ll Forest Service actions involving the northern spotted owl or its habitat will henceforth be carried out in compliance with the requirements of the Endangered Species Act, not 36 C.F.R. § 219.19." *Id.* at 40413.

In October 1990, SAS filed an amended complaint alleging that this Forest Service announcement notice was unlawful. SAS alleged that the Forest Service had to (1) prepare regional guidelines that ensured a viable population of the species throughout the Pacific Northwest's national forests pursuant to the NFMA and (2) comply with the requirements of the ESA. SAS sought an injunction against all timber sales in spotted owl habitat pending preparation of such regional guidelines, as well as an accompanying environmental impact statement.

Meanwhile, Congress enacted section 318 of the Department of the Interior and Related Agencies Appropriations Act for Fiscal Year 1990, Pub.L. No. 101–121, § 318, 103 Stat. 701, 745–50 (1989) ("section 318"). Section 318, which became law on October 23, 1989, was basically designed to provide a short-term supply of timber to Washington and Oregon lumber mills by limiting judicial review. On September 18, 1990 we issued our opinion finding section 318(b)(6)(A) unconstitutional under the separation of powers doctrine. *Seattle Audubon Soc'y v. Robertson,* 914 F.2d 1311 (9th Cir.1990), *cert. granted,* —— U.S. ——, 111 S.Ct. 2886, 115 L.Ed.2d 1051 (1991).

Subsequently, SAS resumed its challenge to twelve proposed timber sales as failing to meet the requirements of existing environmental laws. The Forest Service argued that section 318 "occupies the field," and therefore, existing laws were no longer applicable.

The district court disagreed with the Forest Service, noting that this court had clearly ruled that, in fact, the opposite was true. "Section 318 does not, by its plain language, repeal or amend the environmental laws ... though some sections add additional requirements." *Seattle Audubon,* 914 F.2d at 1316. On December 16, 1990, the district court ruled that twelve fiscal year 1990 timber sales advertised by the

---

identified, and measures shall be prescribed to prevent the destruction or adverse modification of such habitat. Objectives shall be determined for threatened and endangered species that shall provide for, where possible,

their removal from listing as threatened and endangered species through appropriate conservation measures, including the designation of special areas to meet the protection and management needs of such species.

Forest Service could not be awarded because the agency had failed to comply with applicable laws. In particular, the court found that the Forest Service had failed to develop "plans for units of the national forest system" that "incorporate the standards and guidelines" required by 16 U.S.C. § 1604(g) and 36 C.F.R. § 219.19 (NFMA). The court enjoined the sales pending the Forest Service's compliance with the NFMA. The Forest Service, however, was given leave to argue its newly raised contention that its alleged compliance with the ESA would eliminate any duties it had with regard to the owls under the NFMA.

On March 7, 1991, Judge Dwyer ruled in favor of SAS on cross-motions for summary judgment, holding that the Forest Service must comply with both the NFMA and the ESA before taking any action that will affect the owls. On May 23, 1991, after a hearing, the district court ordered the Forest Service to prepare new regional guides pursuant to the NFMA by March 5, 1992 that would ensure the owl's viability. The district court further enjoined the advertisement and award of timber sales within owl habitat in the interim. This appeal followed.

### B. *Discussion*

■ According to the Forest Service, the sole question presented in its appeal is whether its duty under 36 C.F.R. § 219.19 to maintain a viable population of owls ceased when the owl was listed under the Endangered Species Act. Judge Dwyer in his March 7 order held that the Forest Service had violated the NFMA by failing to have a plan in place to ensure the viability of all native vertebrate species, including the northern spotted owl. He correctly observed that there is little support for the government's newly announced position that under the NFMA it need not plan for the survival of endangered species. In rejecting the Agency's position that once a species becomes threatened or endangered, only the Endangered Species Act defines the Forest Service's duties, Judge Dwyer stated that "the record shows that the Forest Service has understood at all times that

NFMA continues to apply after a species is listed under ESA."

This is readily apparent from the Forest Service Regulations themselves. The key part of the regulation at issue here, 36 C.F.R. § 219.19, expressly requires the planning process under the NFMA to identify habitat "critical for threatened and endangered species" and to determine objectives "for threatened and endangered species that shall provide for, where possible, their removal from listing as threatened and endangered species through appropriate conservation measures...." *Id.* § 219.19(a)(7). The Forest Service has used threatened or endangered species as indicator species pursuant to the same regulation. *Id.* § 219.19(a)(1).

Moreover, section 219.19 is not the only regulation requiring the Forest Service to plan for threatened and endangered species under the NFMA. For example, section 219.27 provides that the "minimum specific management requirements" shall "[i]nclude measures for preventing the destruction or adverse modification of critical habitat for threatened and endangered species." *Id.* § 219.27(a)(8). The Regulations were promulgated pursuant to the directive of the NFMA to provide for diversity of plant and animal communities in order to meet overall multiple use objectives. 16 U.S.C. § 1604(g)(3)(B). The effect of the Forest Service's position in this litigation, were it to be adopted, would be to reward the Forest Service for its own failures; the net result would be that the less successful the Forest Service is in maintaining viable populations of species as required under its regulations, the less planning it must do for the diversity of wildlife sought by the statute. This is directly contrary to the legislative purpose of the National Forest Management Act.

Nor is there any support in the Endangered Species Act for the Forest Service premise that a threatened or endangered species under the ESA is not a "viable" species within the definition of the Forest Service regulation. A species may be listed by the Fish and Wildlife Service under the Endangered Species Act solely because

of "threatened" destruction to its habitat. *See* 16 U.S.C. § 1533(a)(1)(A). A species may also be listed simply because of "the inadequacy of existing regulatory mechanisms" to protect it. *See id.* § 1533(a)(1)(D). The ESA list is not a list of animals to be written off. It is a mandate for all agencies involved to take aggressive steps to avoid a species' extinction and preserve its viability. *See id.* § 1531(b) and (c).

We thus agree with the district court that the Forest Service's current, and belated, interpretation of its statutory mandate and regulation is not entitled to any deference. As the district court said in its March 7 order: "[A]n agency cannot exempt itself from duties plainly imposed by law; it cannot decide that only one of two statutes governs its activities when the laws themselves, and the implementing regulations, clearly show that both apply." (Citations omitted).

The Forest Service attempts to buttress its interpretation of the law by contending that, in fact, it is now impossible for it to design a plan to maintain the viability of the spotted owl. This contention is apparently made for the first time on appeal and is not supported by evidence in the record. The Forest Service will doubtless have to coordinate its planning efforts with other agencies such as the Fish and Wildlife Service and the Bureau of Land Management ("BLM"), coordination contemplated under the Endangered Species Act. The Agency's systematic refusal to follow the law in the past, as chronicled by the district court, is not an excuse for its avoiding the concurrent requirements of the NFMA and ESA in the future.

## II. *THE WCLA APPEAL*

In its appeal, the WCLA intervenors additionally challenge that portion of Judge Dwyer's order requiring an Environmental Impact Statement, contending that it was based upon a misinterpretation of section 318 of the Department of Interior Appropriations Act for Fiscal Year 1990, Pub.L. 101–121, 103 Stat. 743 (1989). This contention is, as a matter of law, incorrect. The district court did not "interpret" section 318 to require a particular result. It used it as a guide in fashioning a remedy and determining the appropriate time periods.

WCLA also challenges the district court's findings concerning irreparable harm, but these challenges are without substance. The district court's findings are not clearly erroneous and the remedy fashioned was not an abuse of discretion.

## III. *THE MIGRATORY BIRD TREATY ACT*

In appeals nos. 91–35528 and 91–35782, the Seattle Audubon Society and the Portland Audubon Society cross-appeal and appeal, respectively, the judgments of the district courts holding that the Migratory Bird Treaty Act, 16 U.S.C. §§ 703–711 (1985), does not prohibit the Forest Service and the Bureau of Land Management ("BLM") from selling and logging timber from lands within areas that may provide suitable habitat for the northern spotted owl.

The Migratory Bird Treaty Act ("MBTA") makes it illegal to "pursue, hunt, take, capture, kill, attempt to take, capture, or kill ..." any migratory bird or "any part, nest, or egg of any such bird ..., by any means or in any manner", 16 U.S.C. § 703, except as permitted by valid permit issued pursuant to regulations. *See* 50 C.F.R. § 21.11. The northern spotted owl is a migratory bird as defined by the regulations. *Id.* § 10.13.

The SAS and PAS contend that timber sales which destroy owl habitat are tantamount to a proscribed "taking" under the Act. Under the regulations promulgated pursuant to the MBTA, "take" is defined as to "pursue, hunt, shoot, wound, kill, trap, capture, or collect," or to attempt any such act. *Id.* § 10.12. The definition describes physical conduct of the sort engaged in by hunters and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in 1918. The statute and regulations promulgated under it make no mention of habitat modification or destruction.

Under the Endangered Species Act enacted in 1973, in contrast, the word "take" is defined in a broader way to include "harass," and "harm," in addition to the verbs included in the MBTA definition. 16 U.S.C. § 1532(19). The broadest term, "harm," which is not included in the regulations under the Migratory Bird Treaty Act, is defined by ESA Regulation to include habitat modification or degradation. "Harm" under the Endangered Species Act definition of "take" means:

> [A]n act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering.

50 C.F.R. § 17.3.

We agree with the Seattle district court that the differences in the proscribed conduct under ESA and the MBTA are "distinct and purposeful." The ESA was enacted in 1973. Congress amended the Migratory Bird Treaty Act the following year, but did not modify its prohibitions to include "harm." *See* Pub.L. 93–300 § 1, 88 Stat. 190 (1974). Courts have held that the Migratory Bird Treaty Act reaches as far as direct, though unintended, bird poisoning from toxic substances. *See, e.g., United States v. FMC Corp.*, 572 F.2d 902 (2d Cir.1978) (killing of migratory birds by dumping waste water); *United States v. Corbin Farm Serv.*, 444 F.Supp. 510 (E.D.Cal.), *affirmed on other grounds*, 578 F.2d 259 (9th Cir.1978) (deaths of birds resulting from misapplication of pesticides). In *FMC Corp.*, the Second Circuit imposed strict criminal liability for poisoning birds by analogizing to principles of strict tort liability arising from dangerous conditions

or substances. 572 F.2d at 906–08. That case involved the manufacture of a highly toxic pesticide. *Id.* at 906. In *Corbin Farm Serv.*, the district court simply held that the MBTA can "constitutionally be applied to impose criminal penalties on those who did not intend to kill migratory birds." 444 F.Supp. at 536. The reasoning of those cases is inapposite here. These cases do not suggest that habitat destruction, leading indirectly to bird deaths, amounts to the "taking" of migratory birds within the meaning of the Migratory Bird Treaty Act. We are not free to give words a different meaning than that which Congress and the Agencies charged with implementing congressional directives have historically given them under the Migratory Bird Treaty Act and the Endangered Species Act. Habitat destruction causes "harm" to the owls under the ESA but does not "take" them within the meaning of the MBTA.

## IV. *THE APPLICABILITY OF SECTION 314*

■ In consolidated appeal nos. 91–35802 and 91–35992, the Portland Audubon Society appeals the district court's order denying PAS leave to file an amended complaint. PAS sought to challenge certain decisions of the Bureau of Land Management to proceed with logging without preparing supplemental environmental impact statements to take into account new information concerning potential extinction of the owl. Such a claim was expressly barred by the terms of section 314 of the Fiscal Year 1989 Appropriations Bill, Pub.L. 100–446, 102 Stat. 1774, 1825 (1988). *See Portland Audubon Soc'y v. Lujan*, 884 F.2d at 1240.[2]

2. Section 314 provides:

The Forest Service and Bureau of Land Management are to continue to complete as expeditiously as possible development of their respective Forest Land and Resource Management Plans to meet all applicable statutory requirements. Notwithstanding the date in section 6(c) of the NFMA (16 U.S.C. 1600), the Forest Service, and the Bureau of Land Management under separate authority, may continue the management of lands within their jurisdiction under existing land and resource management plans pending the completion of new plans. Nothing shall limit judicial review of particular activities on these lands: Provided, however, That there shall be no challenges to any existing plan on the sole basis that the plan in its entirety is outdated, or in the case of the Bureau of Land Management, solely on the basis that the plan does not incorporate information available subsequent to the completion of the existing plan:

Congress reenacted that provision in 1989 for fiscal year 1990, but did not reenact the provision as part of the 1991 Appropriations Bill. Contending that the provision expired on September 30, 1990, PAS thereafter sought unsuccessfully to amend its complaint to reallege claims under the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA"). The district court certified the issue of the continued viability of the section 314 bar and we accepted jurisdiction pursuant to 28 U.S.C. § 1292(b).

The operative language of Section 314 of the 1990 appropriations bill was originally enacted as part of the 1988 appropriations bill. *See* Continuing Appropriations Act for Fiscal year 1988, Pub.L. No. 100–202, § 314, 101 Stat. 1329–254 (1987). It was reenacted (and extended to cover the BLM) for 1989 as Section 314. It was again reenacted for 1990 as Section 312. *See* Dept. of Interior and Related Agencies Appropriations Bill for Fiscal Year 1989, Pub.L. No. 100–446, § 314, 102 Stat. 1774, 1825 (1988); Department of Interior and Related Agencies Appropriations Bill for Fiscal Year 1990, Pub.L. No. 101–121, § 312, 103 Stat. 701, 743 (1989). The section was not reenacted for fiscal year 1991 and has not been renewed since. Accordingly, the question is whether the provision expired at the end of fiscal 1990. We conclude that the answer is yes.

As a general rule of thumb, appropriations acts are in force during the fiscal year of the appropriation and do not work a permanent change in the substantive law. Where, however, Congress affirmatively intends to change the substantive law by suspending or repealing a statute previously enforced, it can do so by an amendment to an appropriation bill. *See United States v. Will,* 449 U.S. 200, 221–222, 101 S.Ct. 471, 483–484, 66 L.Ed.2d 392 (1980); *United States v. Dickerson,* 310 U.S. 554, 555–556, 60 S.Ct. 1034, 1035–1036, 84 L.Ed. 1356 (1940). The question is one of legislative intent. In this case Congress has expressed its intent to alter the substantive

law, but has also demonstrated its intent to make this restriction effective for only a year at a time. Congress reenacted the provisions twice, at the expiration of each of the next two fiscal years. It did not reenact the provision for fiscal 1991.

Appellees contend that the statute itself provides that claims under NEPA be restricted for the entire time it takes the appellees to complete new plans. They rely on that portion of the section that states that the Forest Service and the BLM shall continue the management of lands under existing plans "pending the completion of new plans." This phrase however relates to administration of lands, not the duration of section 314. The language paraphrases preexisting language in the NFMA. Pursuant to the NFMA, the agencies were supposed to complete management plans by September 30, 1985. 16 U.S.C. § 1604(c). That NFMA goes on to say that:

> Until such time as a unit of the national Forest System is managed under plans developed in accordance with this subchapter, the management of such unit may continue under existing land and resource management plans.

*Id.*

Had Congress intended to keep the restrictions of section 314 in place more than a year at a time, it could have so provided or enacted the instructions as part of permanent, substantive legislation. It would not have proceeded to consider the provision on an annual basis for three years in a row.

The plaintiffs should have been granted leave to amend their complaint to allege NEPA claims no longer barred by the annual appropriations act restrictions originally adopted as Section 314.

### Conclusion

For the foregoing reasons, the orders of the district court before us for review in appeal nos. 91–35528, 91–35529, 91–35563

Provided further, That any and all particular activities to be carried out under existing

plans may nevertheless be challenged.

and 91–35782 are AFFIRMED. The order of the district court before us in consolidated appeal nos. 91–35802 and 91–35992 is REVERSED AND REMANDED with instructions to allow plaintiffs leave to file an amended complaint. All parties shall bear their own costs on appeal.