**SEATTLE AUDUBON SOCIETY,
et al., Plaintiffs,**

v.

**James R. MOSELEY, et al., Defendants,**

**and**

**Washington Contract Loggers
Association, et al.,
Intervenors.**

**No. C92–479WD.**

United States District Court,
W.D. Washington,
at Seattle.

July 2, 1992.

Todd D. True, Victor M. Sher, Sierra Club Legal Defense Fund, Seattle, Wash., for plaintiffs Seattle Audubon Soc., Washington Environmental Council, Pilchuck Audubon Soc., Nat. Audubon Soc., Portland Audubon Soc., Lane County Audubon Soc., The Wilderness Soc., Headwaters, Klamath Forest Alliance, Northcoast Environmental Center and Forest Conservation Council.

Christopher Lee Pickrell, U.S. Atty's Office, Seattle, Wash., Wells Burgess, Steve O'Dell, U.S. Dept. of Justice, Environment and Natural Resources Div., General Litigation Section, Washington, D.C., for defendants James R. Moseley and U.S. Forest Service.

Mark C. Rutzick, Preston, Thorgrimson, Shidler, Gates & Ellis, Portland, Or., for intervenors-defendants Washington Contract Loggers Ass'n, Burgess Logging Co., Inc., Lone Rock Timber Co., Inc., Jackie Bryan Cox, Freres Lumber Co., Inc., Norman V. Persons, A. Troy Reinhart, Gregory A. Miller and Northwest Forest Resource Council.

MEMORANDUM DECISION
AND INJUNCTION

DWYER, District Judge.

I.

INTRODUCTION

This order follows the order on cross-motions for summary judgment entered on

May 28, 1992 ("May 28 order") (Dkt. # 138). The present case is a sequel to *Seattle Audubon Society v. Evans,* 771 F.Supp. 1081 (W.D.Wash.1991), *aff'd,* 952 F.2d 297 (9th Cir.1991). The *Evans* decision required the United States Forest Service to adopt by March 5, 1992, revised standards and guidelines to ensure the viability of the northern spotted owl in national forests located in Forest Service Regions Five and Six. In this case plaintiffs Seattle Audubon Society, et al. ("SAS"), challenge the legality of a final environmental impact statement ("FEIS") issued by the Forest Service, and a record of decision ("ROD") adopted by defendant James R. Moseley as Assistant Secretary of Agriculture, in response to the order in *Evans.* The case was bifurcated by agreement so that liability would be decided first and relief decided afterward if necessary. The May 28 order granted in part SAS's motion for summary judgment, finding that in three respects the Forest Service had failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* A preliminary injunction was issued on May 29 enjoining the agency from awarding further timber sales in Regions Five and Six that would log suitable habitat for the northern spotted owl until an order as to relief could be entered. (Dkt. # 139). Briefs and declarations on the issue of injunctive relief were then filed and a hearing held on June 22, 1992. All materials submitted, and the arguments of counsel, have been fully considered.

## II.

### STANDING AND RIPENESS

The standing of SAS to challenge the EIS and ROD, and the ripeness of the case for judicial review, have already been decided but are raised again by the Forest Service in view of *Lujan v. Defenders of Wildlife,* —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Court in *Defenders* summarized the test as follows:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

—— U.S. at ——, 112 S.Ct. at 2136 (citations and footnote omitted).

*Defenders* involved a regulation limiting the consultation requirement of the Endangered Species Act to proposed actions to be taken in the United States or on the high seas, excluding actions to be taken in foreign countries. Finding that the plaintiffs lacked standing to challenge the regulation, the Court noted that they had shown only vague notions of some day visiting, or revisiting, the foreign countries where the potentially affected species were located. This was held to be too remote. *Id.* at ——, 112 S.Ct. at 2146. The Court also stated, however, that a person

who observes or works with a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist.

*Id.* at ——, 112 S.Ct. at 2140.

■ Here, the declarations on file establish standing to sue under *Defenders* and earlier holdings. They include averments such as these:

I visit them [old growth forests] frequently as a hiker, camper, birdwatcher, and photographer[;]

[I have] plans this summer to re-create myself within [the forests;]

I am an avid naturalist and birdwatcher. I have attempted to see northern spotted owls in the past and plan to continue to find them in the future.

Marshall Declaration at 2, ¶ 3 (Dkt. # 170); Kerr Amended Declaration at 3, ¶ 5 (Dkt.

#170); Phillips–Howard Amended Declaration at 1, ¶ 2 (Dkt. # 170).

One declaration states:

> I am a regular and frequent visitor to the old-growth forests. I consider the public forests of Oregon, Washington and northern California my backyard. Because I live in Eugene, Oregon, all of these forests are readily accessible to me by relatively short car trips. I regularly travel in and about these forests. In addition to the scores of visits I made during the preparation of my book, I also visit old-growth forests for recreational and educational purposes. During these trips I observe and enjoy the forests, their wildlife, streams, and views. I have called spotted owls, observed and listened to numerous other bird species, such as marbled murrelets and winter wrens, and fished for trout and salmon. I have made these trips regularly (about 30 times a yar [sic]) in the past and I plan to continue them in the future. For example, I have trips to federal old-growth forests planned for next weekend and the July 4th holiday weekend.

Wood Declaration at 2, ¶ 4 (Dkt. # 170).

The threatened injury to plaintiffs from further logging of old growth habitat for the spotted owl is concrete, specific, imminent, caused by the agency conduct in question, and redressable by a favorable ruling.

▓ Standing and ripeness were elucidated by the court of appeals in *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1513–19 (9th Cir.1992). As to ripeness, the court held that

> waiting until the Department acts on a specific project would not be an adequate remedy. Moreover, a future challenge to a particular, site-specific action would lose much force once the overall plan has been approved—especially if the challenge were premised on the view that the overall plan grew out of erroneous assumptions.

*Id.* at 1519.

The harm will be done here if the Forest Service adopts an unlawful regulation under which forest management plans are to be adopted and logging rights sold. To postpone judicial review until specific timber sales were designed and about to be auctioned would defeat the interests not only of the plaintiffs but of the agency and the loggers as well.

### III.

### SUMMARY JUDGMENT RULINGS UNDER NEPA

▓ The first two NEPA violations found in the May 28 order do not need further explanation at this point. The third one does. That is the ruling that the Forest Service has violated NEPA by failing to explain or justify a rating in the FEIS of Alternative B, the plan chosen, as having a "low to medium-low probability of providing for viable populations of late-successional forest associated wildlife species other than northern spotted owls." FEIS at 3 & 4–140. The Forest Service argues that even if the rating is accurate the plan would be lawful because the agency has been required to adopt only a plan ensuring the viability of the spotted owl, not that of other species. This raises a question of fundamental importance: whether the Forest Service, under the law, may adopt a plan for the owl which it knows or believes will result in the extirpation of other vertebrate species in the national forests.

In *Seattle Audubon Society v. Evans,* 952 F.2d 297, 299–300, the court of appeals summarized the relevant parts of the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.,* and the implementing regulations as follows:

> The NFMA requires the Forest Service to prepare management plans for its national forests to meet the multiple-use objectives of the national forest system. 16 U.S.C. § 1604(a)-(m). In keeping with the statute's mandate, the Forest Service is required to promulgate regulations that will define how the management plans are to provide for a diversity of plant and animal communities. *Id.* § 1604(g)(3)(B). The Forest Service responded by promulgating the regulation at issue in the Forest Service and WCLA

appeals. *See* 36 C.F.R. § 219.19. There are at least three major components to this regulation. First, the regulation establishes as its purpose management of the forest to maintain a "viable population" of existing species. *Id.* Second, the Forest Service must select "indicator species" for the purpose of evaluating wildlife decisions. *Id.* § 219.19(a)(1)–(6). For these species, forest plans "shall establish objectives for the maintenance and improvement of habitat ... to the degree consistent with overall multiple use objectives...." *Id.* § 219.19(a). Threatened and endangered species may be selected as indicators "where appropriate." *Id.* § 219.19(a)(1). A third part of this regulation requires the Forest Service to identify habitats critical to threatened or endangered species and prescribe measures to prevent their adverse modification. *Id.* § 219.19(a)(7). The Forest Service is also required to determine objectives for appropriate conservation measures for threatened or endangered species. *Id.*

NFMA was preceded by the Multiple–Use Sustained–Yield Act of 1960 ("MUSY"), in which Congress declared "that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. The statute recognized that "some land will be used for less than all of the resources." 16 U.S.C. § 531.

■ Congress gave more specific direction in 1976 in NFMA, which requires that national forest planning "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." 16 U.S.C. § 1604(g)(3)(B). This section confirms the Forest Service's duty to protect wildlife. As stated in a leading law review article:

> [W]hen the section is read in light of the historical context and overall purposes of the NFMA, as well as the legislative history of the section, it is evident that section 6(g)(3)(B) requires Forest Service planners to treat the wildlife resource as a controlling, co-equal factor in forest management and, in particular, as a substantive limitation on timber production.

Charles F. Wilkinson & H. Michael Anderson, *Land and Resource Planning in the National Forests*, 64 Or.L.Rev. 1, 296 (1985).

Consistent with the statute, the implementing regulations provide that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. § 219.19.

This duty "requires planning for the entire biological community—not for one species alone." Order on Motions for Summary Judgment at 12, No. C89–160WD (March 7, 1991) (Dkt. # 824); *see also SAS v. Evans*, 952 F.2d 297, 301 (9th Cir.1991). The Forest Service has recognized this. The 1988 ROD stated:

> A fundamental mission of land stewardship requires that we sustain viable populations of all native vertebrates in the National Forests by protecting and managing a sufficient amount and distribution of their habitats.

The ROD issued on March 3, 1992, states at 4:

> Forest planning regulations require that diversity of plant and animal communities—the entire biological community—be considered throughout the process for integrated resource planning for Forest Plans (36 C.F.R. 219.13, 219.26 and 219.-27(g)).

To adopt a plan that would preserve a management indicator species ("MIS"), such as the spotted owl, in a way that exterminated other vertebrate species would defeat the purpose of monitoring to assure general wildlife viability. As stated in Wilkinson and Anderson, *supra*, 64 Or. L.Rev. at 300:

> The use of MIS in no way diminishes the requirement to maintain well-distributed, viable populations of existing vertebrates; in fact, proper use of MIS should help to ensure them.

These public lands belong to the entire nation. In enacting NFMA Congress viewed them from the perspective not of a day but of generations. Many observers have noted the Forest Service's habit of maximizing timber production at the cost of the other statutory values. *See, e.g., West Virginia Div. of Izaak Walton League of America, Inc. v. Butz,* 522 F.2d 945, 954–55 (4th Cir.1975); John S. Harbison, *Hard Times in the Softwoods: Contract Terms, Performance, and Relational Interests in National Forest Timber Sales,* 21 Envtl.L. 863, 879 (1991); George C. Coggins & Michael E. Ward, *The Law of Wildlife Management on the Federal Public Lands,* 60 Or.L.Rev. 59, 133 (1981). *See generally* William Dietrich, *The Final Forest* (1992). But such a practice, no matter how long it may have gone on, cannot change what the statute requires.

NFMA and the regulations direct that the forests be managed so as to preserve animal and plant communities. Millions of acres of national forest lands in Regions Five and Six do not consist of spotted owl habitat and are suitable for logging. *See, e.g.,* FEIS, Table 3 & 4–25. Congress's mandate for multiple uses, including both logging and wildlife preservation, can be fulfilled if the remaining old growth habitat is left standing; it cannot be if the old growth in any national forest is logged to the point where native vertebrate species cease to exist there.

The records of this and other reported cases show that management of the national forests in compliance with NFMA is vital because other measures are inadequate for many species. Parks and wilderness areas alone are too small to permit the spotted owl to survive. *See* Findings 1–5, *SAS v. Evans,* 771 F.Supp. at 1088. The efforts of the Fish and Wildlife Service ("FWS") under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.,* come only after a species is threatened or endangered and fall short of systematic management of a biological community. *See* 57 Fed.Reg. 1796, 1804. In this sense the national forests offer a last chance.

■ The Forest Service argues that it should not be required to conduct a viability analysis as to every species. There is no such requirement. As in any administrative field, common sense and agency expertise must be used.

■ The Forest Service also argues that the question of impact on other species will be dealt with in the individual forest plans. But those plans must be adopted in compliance with the regional guidelines and standards. *See* 16 U.S.C. § 1604(g). If the guidelines are illegal, the forest plans cannot fill the gap.

The agency also contends that the statement in the FEIS describing the impact on other species is merely a quotation from comments by the Scientific Panel on Late Successional Forest Ecosystems, not the agency's own view. That is what makes this a NEPA question rather than one under NFMA at this stage. If the "low to medium-low" viability rating were admittedly the Forest Service's own rating, summary judgment under NFMA would be entered now. Full NEPA compliance may or may not lead to a plan different from Alternative B. Whatever plan is adopted, it cannot be one which the agency knows or believes will probably cause the extirpation of other native vertebrate species from the planning areas.

■ Finally, the Forest Service argues that SAS has pleaded only an NFMA violation, not a NEPA violation, as to the "other species" issue. However, the complaint sets forth the factual allegations on the issue and draws the agency's attention to both statutes. That is enough under the rule that "[a]ll pleadings shall be so construed as to do substantial justice." Fed. R.Civ.P. 8(f); *see Self Directed Placement Corp. v. Control Data Corp.,* 908 F.2d 462, 466 (9th Cir.1990); *Friends of the Earth v. Hall,* 693 F.Supp. 904, 914 (W.D.Wash. 1988).

## IV.

### ENTITLEMENT TO INJUNCTIVE RELIEF

The traditional "basis for injunctive relief in the federal courts has always been

irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). As applied in environmental cases, the standards are summarized in *SAS v. Evans*, 771 F.Supp. at 1087–88. The Supreme Court has held in *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987):

> Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

The burden is on the party seeking relief, however, to show a probability of injury serious enough to outweigh any adverse affects from the issuance of an injunction. *Id.* The court must weigh and consider both the public interest, *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir.1988), and the balance of equities among the parties, *Village of Gambell*, 480 U.S. at 545, 107 S.Ct. at 1404.

The findings of fact in *SAS v. Evans*, 771 F.Supp. at 1088–95, numbered 1 through 50, were entered after an eight-day evidentiary hearing and were later incorporated by reference in the court of appeals opinion. *SAS v. Evans*, 952 F.2d at 298. For the period through the date of their entry (May 23, 1991), those findings are conclusively established for purposes of this case under the rule of issue preclusion. The same issues, having been fully tried and decided, cannot be litigated again. *United States v. Mendoza*, 464 U.S. 154, 158, 104 S.Ct. 568, 571, 78 L.Ed.2d 379 (1984); *Shapley v. Nevada Bd. of Prison Comm'rs*, 766 F.2d 404, 408 (9th Cir.1985).

The *Evans* findings establish that as of the date they were entered the spotted owl was threatened with extinction throughout its range; that the Forest Service estimated that an additional 66,000 acres of the bird's habitat would be destroyed if logging sales went forward to the extent permitted by the ISC Report

over the next sixteen months; and that to allow this to happen, in the absence of a legally adopted conservation plan, would risk pushing the species past a population threshold from which it could not recover, would foreclose options that might later prove to have been necessary, and would constitute irreparable harm. "Old growth forests are lost for generations. No amount of money can replace the environmental loss." *See* Findings 22–36, 771 F.Supp. at 1091–94.

The *SAS v. Evans* findings also established that logging sales outside owl habitat areas could be made during the period of an injunction; that the logging of sales already made could go forward; that the demand for wood products was flat; that additional timber supplies could be available from private sources and from restrictions on raw log exports; that the main reasons for mill closures and job losses over the past several years have been modernization of physical plants, changes in product demand, and competition from elsewhere; that job losses will continue regardless of whether the owl is protected; and that preserving old growth forests brings substantial economic benefits. *See* Findings 37–50, 771 F.Supp. at 1094–95.

Finally in *SAS v. Evans*, the court found that there were public interests both in preserving forests and in having government officials act in accordance with law; that "while the loss of old growth is permanent, the economic effects of an injunction are temporary and can be minimized in many ways"; that to "bypass the environmental laws, either briefly or permanently, would not fend off the changes transforming the timber industry"; and that the public interest and the balance of equities required the issuance of an injunction. 771 F.Supp. at 1095–96.

The Forest Service now seeks to do the same thing it sought a year ago—to sell further logging rights in spotted owl habitat areas, consistent with the ISC Report, while the agency is in the process of arriving at a conservation plan. The question is whether the public interest and balance of

equities today, as distinguished from May 1991, require injunctive relief.

The record shows that a continued injunction will keep near-term logging below the level it would reach if the Forest Service proposal were adopted, and that some mills and loggers face shortages. It also shows, however, that the causes of industry changes and supply problems are primarily found elsewhere, and that the spotted owl is probably in graver danger than before. While some of the statistics have changed in the past year, the basic facts remain: Irreparable harm will occur if more owl habitat is logged without a plan in place; timber volume under contract but uncut in the seventeen national forests at issue still exceeds three billion board feet; the FEIS states that the agency can sell more than 800 million board feet annually from lands that are not spotted owl habitat; raw log exports from Washington and Oregon ports in 1991 totalled about 2.5 billion board feet and could be reduced in a variety of ways; demand for wood products remains flat; and if demand rises a corresponding rise in stumpage prices will probably make more private timber available.

The agency points out that in 1992 it has the ISC strategy whereas in 1991 it had no plan. But the *SAS v. Evans* order called for a plan "as required by NFMA and its implementing regulations." 771 F.Supp. at 1096. NFMA incorporates the NEPA procedures, 16 U.S.C. § 1604(g)(1), and no plan as required by the 1991 order has yet been adopted. The Forest Service's request that it be allowed to sell logging rights without a legally-adopted plan in place must be considered in light of the agency's past statements that its proposals would allow the spotted owl to survive, followed by its later admissions that they would not. For example, the 1988 ROD assured the public that the since-abandoned "SOHA" concept "provides sufficient direction for planning habitat management to maintain population viability of spotted owls." 1988 ROD at 10. In the fall of 1990 the agency admitted that this was false. *SAS v. Evans,* 771 F.Supp. at 1089. In the meantime, Congress had largely accepted the Forest Service's assurances in enacting a 1989 stat-

ute, Section 318, which allowed increased cutting in fiscal years 1989–90. *See* 771 F.Supp. at 1084; *see also Robertson v. Seattle Audubon Society,* — U.S. —, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992).

In *Portland Audubon Society v. Lujan,* 795 F.Supp. 1489 (D.Or.1992), the district court in Oregon, issuing an injunction under NEPA, stated:

> The purpose of requiring a Supplemental Environmental Impact Statement is to "ensure[ ] that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Oregon Natural Resources Council,* [490 U.S. at 371], 109 S.Ct. at 1858. Going forward with timber sales without the preparation of a Supplemental Environmental Impact Statement or its equivalent is directly contrary to that purpose.

The same holds true here, and an injunction must be issued.

## V.

### NATURE OF INJUNCTION

■■■■ NEPA requires that an agency charged with preparing an environmental impact statement take a "hard look" at the environmental consequences of the project, and that it disclose the risks, present the alternatives, and respond with reasoned analysis to the opinions of reputable scientists concerning the hazards. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976); *Friends Of the Earth v. Hall,* 693 F.Supp. 904 (W.D.Wash.1988); *Citizens Against Toxic Sprays, Inc. v. Bergland,* 428 F.Supp. 908, 922 (D.Or.1977). That requires here the adoption of an EIS which will cure the shortcomings identified in the May 28 order. As the court held in *Sierra Club v. United States Army Corps of Engineers,* 701 F.2d 1011, 1034–35 (2nd Cir. 1983):

> Enforcement of NEPA requires that the responsible agencies be compelled to prepare a new EIS on those issues, based on adequately compiled information, ana-

lyzed in a reasonable fashion. Only if such a document is forthcoming can the public be appropriately informed and have any confidence that the decision-makers have in fact considered the relevant factors and not merely swept difficult problems under the rug.... Whether the new statement be called an amended EIS, as in *Silva v. Lynn* [482 F.2d 1282 (1st Cir.1973) ], or a supplemental EIS, as in the judgments below, NEPA requires no less.

▆▆▆ The parties differ as to whether the Forest Service should carry out a full-scale statistical viability study of the northern spotted owl. It is possible that an adequate EIS could be prepared either with or without such a study. Dr. Jack Ward Thomas, team leader of the ISC, has explained why his committee did not make one, and Dr. Eric Forsman has opined that none is necessary. Thomas Declaration at 13–14, ¶ 7 (Dkt. # 112); Forsman Declaration at 7–8, ¶ 10 (Dkt. # 111). The courts in applying NEPA do not substitute their judgment for the agency's on the scientific or technical details of compliance. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989). If the Forest Service decides not to make a further statistical viability study, the EIS should answer the criticisms by explaining why it was not necessary or feasible to make one.

## VI.

### TIME FOR COMPLIANCE

▆▆▆ The history of this matter shows the need for a timetable to assure prompt agency compliance. The Forest Service has been gathering and evaluating data on the spotted owl for years. In October 1989 Congress directed the agency to have a revised owl plan in place eleven months later. The Forest Service did not comply or attempt to comply. *See* 771 F.Supp. at 1089. In May 1991 this court ordered the adoption of a plan by March 1992; the net result was to give the agency a seventeen-month extension to finish the job that Congress had mandated be done by September 30, 1990.

While the Forest Service asked for a specific time allowance in *SAS v. Evans, see* 771 F.Supp. at 1090, it now contends that the court lacks the power to impose a timetable at all, and that none should be adopted. But the absence of a deadline could make an injunction meaningless; without a time for compliance, there could be open-ended delay. The interests of all concerned, including the timber industry, require the earliest possible resolution. Deadlines have been ordered in other environmental cases. *See SAS v. Evans,* 952 F.2d 297 (9th Cir.1991); *Portland Audubon Soc'y v. Lujan,* 795 F.Supp. 1489 (D.Or.1992); *Runway 27 Coalition, Inc. v. Engen,* 679 F.Supp. 95, 109 (D.Mass.1987). A timetable is necessary here, and one will be adopted as soon as the agency's time estimate and the other parties' comments are received in accordance with Section VII, below.

## VII.

### INJUNCTION

For the reasons stated, it is ordered and adjudged that:

A. The Forest Service is enjoined to prepare a new or supplemental EIS in compliance with NEPA, curing the defects identified in the May 28, 1992, summary judgment order, and defendant Moseley is enjoined to adopt a new ROD following completion of the EIS;

B. The Forest Service is directed to file by July 14, 1992, its proposed schedule for completion of the steps required by paragraph A, above, and SAS and WCLA are directed to file by July 17, 1992, any comments on the schedule;

C. The court will issue an order adopting a timetable after the agency's proposed schedule and the other parties' comments have been received; and

D. The Forest Service is enjoined from auctioning or awarding any additional timber sales in Forest Service Regions Five and Six that would log suitable habitat for the northern spotted owl until revised standards and guidelines in compliance with

NEPA and NFMA are adopted and in effect.