**The WILDERNESS SOCIETY, Sierra Club, Tennessee Audubon Council, Tennessee Citizens for Wilderness Planning, and Smoky Mountains Hiking Club,**

v.

**John E. ALCOCK, as Regional Forester of the Southern Region of the U.S. Forest Service; John Ramey, as Forest Supervisor of the Cherokee National Forest; F. Dale Robertson, as Chief of the U.S. Forest Service; and Edward Madigan, as Secretary of the United States Department of Agriculture**

**and**

**TENNESSEE FORESTRY ASSOCIATION, Multi–Use Association of the Southeast, National Hardwood Lumber Association, and Mountain City Lumber Company (Intervening Defendants).**

Civ. No. 1:92–cv–1040–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 1994.

---

Gregory W. Blount, Constangy Brooks & Smith, Atlanta, GA, Charles W. Burson, phv, Office of State Atty. Gen., Nashville, TN, Paul A. Lenzini, phv, Wilkinson Barker Knauer & Quinn, Washington, DC, for State of Tennessee Wildlife Resources Agency, International Ass'n of Fish and Wildlife Agencies.

Gregory R. Crochet, Angela Mae Gottsche, Kutak Rock, Atlanta, GA, David W. Carr, Jr., phv, Deborah M. Wassenaar, phv, Charlottesville, VA, Olivia Baker, phv, Kutak Rock, Washington, DC, for Wilderness Soc., Sierra Club, Tennessee Audubon Council, Tennessee Citizens for Wilderness Planning, Smoky Mountains Hiking Club.

Russell Glenn Vineyard, Office of U.S. Atty., N.D. of Georgia, Atlanta, GA, for John E. Alcock, John Ramey, F. Dale Robertson, Edward Madigan.

Alexander Stephens Clay, IV, Mary Lillian Walker, Kilpatrick & Cody, Atlanta, GA, Steven P. Quarles, phv, Thomas R. Lundquist, phv, Crowell & Moring, Washington, DC, for Tennessee Forestry Ass'n, Multi–Use Ass'n of the Southeast, National Hardwood Lumber Ass'n, Mountain City Lumber Co.

## ORDER

ORINDA D. EVANS, District Judge.

This environmental suit challenging the 1986 Final Land and Resource Management Plan for the Cherokee National Forest is before the court on the following motions: (1) Plaintiffs' revised motion for summary judgment, (2) the motion for summary judgment of John E. Alcock, John Ramey, F. Dale Robertson, and Edward Madigan ("Federal Defendants"), (3) the motion of State of Tennessee Wildlife Resources Agency and International Association of Fish and Wildlife Agencies for leave to file amici curiae brief, (4) Plaintiffs' notice of objection and motion to strike, (5) two motions to supplement briefing by the Tennessee Forestry Association, Multi–Use Association of the Southeast, National Hardwood Lumber Association, and Mountain City Lumber Company ("Timber Intervenors"), (6) the Federal Defendants' motion to supplement briefing, and (7) Plaintiffs' motion for oral argument on summary judgment motion. Responses in opposition have been filed to all of the foregoing motions.

In 1897, Congress established the national forests. The act states that "[n]o national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States." 16 U.S.C. § 475.

In the Multiple–Use Sustained–Yield Act of 1960, 16 U.S.C. §§ 528–531 ("MUSYA"), Congress set forth its policy that the national forests are to be administered in order to provide "for outdoor recreation, range, tim-

ber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528.[1] In furtherance of this policy, Congress directed the United States Forest Service ("Service"), a component of the Department of Agriculture, "to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom." 16 U.S.C. § 529. Congress defined "multiple use" as

> [t]he management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.

16 U.S.C. § 531(a). Congress defined "sustained yield of the several products and services" as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land." 16 U.S.C. § 531(b).

In the National Forest Management Act of 1976 ("NFMA"), Congress directed the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). Congress further directed that

> [i]n developing, maintaining, and revising plans for units of the National Forest Sys-

1. In § 528, Congress expressly stated that the MUSYA was supplemental to, not in derogation

of, 16 U.S.C. § 475.

tem pursuant to this section, the Secretary shall assure that such plans—

(1) provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the [MUSYA], and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; and

(2) determine forest management systems, harvesting levels, and procedures in the light of all of the uses set forth in subsection [ (e) ](1) of this section, the definition of the terms "multiple use" and "sustained yield" as provided in the Multiple–Use Sustained–Yield Act of 1960, and the availability of lands and their suitability for resource management.

16 U.S.C. § 1604(e). Congress required that land and resource management plans be revised at least every fifteen years. 16 U.S.C. § 1604(f)(5).

In § 1604(g) of the NFMA, Congress required the Secretary of Agriculture to promulgate regulations "that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection." The "guidelines and standards" that § 1604(g) prescribes address compliance with the National Environmental Policy Act ("NEPA"); suitability of lands for resource management; inventory of renewable resources, soil, and water; methods to identify special conditions or hazards vis-a-vis resources; "consideration of the economic and environmental aspects of various systems of renewable resource management," 16 U.S.C. § 1604(g)(3)(A); "provi[sions] for diversity of plant and animal communities," 16 U.S.C. § 1604(g)(3)(B); study and evaluation of management systems so as to avoid impairment of the land's productivity; allowance of increased harvest levels only if certain conditions are met; allowance of timber harvesting only if certain conditions are met; and allowance of certain timber cutting techniques only if certain conditions are met.

Regulations have been promulgated pursuant to § 1604(g). *See* 36 C.F.R. §§ 219.1–219.29 (1993). Section 219.1(b) states in part that land and resource management plans "guide all natural resource management activities and establish management standards and guidelines for the National Forest System. They determine resource management practices, levels of resource production and management, and the availability and suitability of lands for resource management." Among other things, the regulations establish a ten-step process that planners must follow in creating land and resource management plans. The steps are "identification of purpose and need," "planning criteria," "inventory data and information collection," "analysis of the management situation," "formulation of alternatives," "estimated effects of alternatives," "evaluation of alternatives," "preferred alternative recommendation," "plan approval," and "monitoring and evaluation." 36 C.F.R. § 219.12(b)–(k).

The Cherokee National Forest, which contains approximately 623,565 acres, is located on the eastern boundary of Tennessee. In 1986, the Service, acting pursuant to the NFMA and the regulations promulgated under it, adopted a land and resource management plan ("Plan") for the Forest. A Final Environmental Impact Statement ("FEIS") accompanied the Plan.

The process that led to the adoption of the plan began in the early 1980's. The Service developed seven management alternatives for the Forest, as well as a Draft Environmental Impact Statement ("DEIS"). In 1985, the Service published and distributed for public comment all seven alternatives, as well as the DEIS. The Service proposed that the seventh alternative be adopted. After receiving numerous public comments about the proposed alternative, the Service made some changes to the alternative and then adopted it as the Plan on April 1, 1986.

Plaintiffs immediately filed an administrative appeal of the Plan.[2] A partial settlement was reached in August 1988.[3] The parties

---

2. The administrative appeal record is cited as "App.R."

3. Under the settlement agreement, the Service, among other things, performed further environmental analysis, issued a draft supplement to the

submitted the issues that the settlement did not resolve to the Chief of the Service. After receiving written and oral arguments, the Chief rendered a decision in December 1990. The Secretary of Agriculture declined to review the Chief's decision. Plaintiffs filed this action in May 1992.

The Plan is a bound, 300–page document. Chapter I is entitled "Forest Plan Introduction." It states that the Plan "establishes management direction and associated long-range goals and objectives for the Forest for the next 10 to 15 years." (Plan at I–1.) Chapter I summarizes the Plan's purpose and structure, and the Plan's relationship to the FEIS and higher-level planning goals. It also describes the location of the Forest, the administrative organization of the Forest, and the staff that manages the Forest.

Chapter II of the Plan is entitled "Analysis of the Management Situation Summary." It addresses the resources of the Forest as a prelude to long range planning. The chapter describes the Forest's physical, biological, social, and economic characteristics. Later, the chapter discusses the Forest's "current management, demand, and supply potentials." (Plan at II–10.) This portion of the chapter describes current timber demand in the United States and estimates demand in the coming 50 years. It classifies the land in the Forest, subtracting from the total acreage the various categories of land that are deemed unsuitable for producing timber, thereby yielding acreage designated "tentatively suitable" as a timber resource. *Id.* at II–21. Out of the 616,406 acres of forest land in the Forest, 579,752 acres are identified as tentatively suitable for timber production.

Chapter III is entitled "Plan Responses to Issues, Concerns and Opportunities." Among other things, it addresses the following query: "How can the timber resource be best managed to meet the demand for timber products and concurrently meet the demands of other resources?" *Id.* at III–6. The response to this query is policy-type pronouncements regarding timber-harvesting methods, the use of herbicides, the availability of firewood, hardwood production, pest

FEIS for public comment, and in February 1990

management methods, and other matters. With regard to timber-harvesting methods, Chapter III states that "[t]he even-aged silvicultural system will be applied to the suitable forest land on the Cherokee National Forest." *Id.*

Chapter III also includes a table that summarizes the assignment of various portions of the Forest to "visual quality objectives" ("VQOs"), with the objectives ranging from the "preservation" category to the "maximum modification" category. This table is followed in part by the following commentary:

> Timber management objectives may be difficult to achieve while meeting other resource management requirements as well as visual quality objectives. Public concern for the visual quality of National Forest lands, especially in the Blue Ridge Province, has become increasingly acute. This concern is not expected to diminish soon, so public demand for increased goods and services from this same land base may present occasional conflicts.

*Id.* at III–10.

Chapter IV is entitled "Forest Management Direction." It again notes that the Plan provides "long range management direction" for the Forest. *Id.* at IV–1. Chapter IV states that the Plan is implemented "through the Program Development and Budgeting and Annual Work Planning processes." *Id.* It declares that the Plan

> provides guidance for developing multiyear implementation programs for each Ranger District. The Plan's management area directions, outputs and standards and guidelines are translated into these multiyear program budget proposals which specifically identify the activities and expenditures necessary to achieve the direction provided by the Forest Plan. These implementation programs form the basis for the Forest's annual program budget.

*Id.* Chapter IV also states that when appropriate for particular project level decisions, additional environmental assessments will be undertaken.

adopted a supplemental FEIS.

Chapter IV contains tables setting forth "Forestwide Management Goals," *id.* at IV–5, as well as goals for eighteen specific "Management Areas" in various portions of the Forest, *id.* at IV–72.[4] The broad categories of "Management Practices/Activities" that the tables identify include "recreation"; "wildlife"; "timber"; "water, soil and air"; "minerals and geology"; "lands"; "facilities"; and "protection." Under the heading "General Direction" the tables state the Plan's determination as to whether the land is classified as suitable for timber production and, if so, on what basis. Table IV–1, captioned "Planning Targets, Activities and Costs for the Cherokee National Forest," contains "allowable sale quantity" figures for timber sales for years beginning in 1984 and extending through 2030. For the years 1986 through 1990, the allowable sale quantity of timber from the Forest (i.e., the amount that is to be *offered* for sale) is targeted at 8.1 million cubic feet annually. Table IV–4 similarly recognizes an allowable sale quantity of 8.1 million cubic feet of timber annually.

Regarding timber sales, Chapter IV refers to Appendix C, which is entitled "Ten Year Timber Sale Action Plan" ("action plan"). *Id.* at IV–58. The action plan sets out targeted harvest yields for specific geographic areas (denominated as "compartments" in specific Ranger Districts). However, though the action plan extends through 1994, no specific areas are designated for timber harvesting in the years following 1989.

Chapter IV also contains a table entitled "Land Classification." *Id.* at IV–54. Initially drawing on the analysis noted above in Chapter II, the table shows that the total amount of forest land is 616,406 acres. The amount withdrawn from timber production is 32,902 acres, while the amount not capable of producing industrial wood is 3,752 acres. The table states that no land is physically unsuited for timber production. From these figures, 579,752 acres are identified as tentatively suitable for timber production. Then, another 197,871 acres are designated as unsuitable for timber production due to "(a)

assignment to other resource uses to meet Forest Plan objectives; (b) management requirements; and (c) not being cost efficient in meeting Forest Plan objectives over the planning horizon." *Id.* at IV–54 n. 2. The total amount of land designated as unsuitable for timber production is 234,525 acres, while that designated as suitable is 381,881 acres.

Chapter V of the Plan is entitled "Implementation." It discusses procedures for monitoring and evaluating the implementation of the Plan. Regarding monitoring, it states that "[m]onitoring requirements can be divided into (1) the monitoring for accomplishment of practices (i.e., the actual execution on the ground of standards and guidelines called for in Forest wide and management area direction) and (2) monitoring outputs and effects." *Id.* at V–1. Regarding evaluation, it states that "[e]valuation of results of the monitoring program will be documented in the Annual Forest Plan Evaluation Report." *Id.* at V–2.

Chapter VI of the Plan is a glossary of terms used in the Plan. Chapter VII contains various appendices referred to in earlier chapters.

The Plan has been amended twenty-two times since 1986. The first amendment occurred in April 1987, and the most recent was in May 1994.

Amendment # 5, dated May 1988, changes the Land Classification table in Chapter IV. The amount of land withdrawn from timber production is increased from 32,902 acres to 66,294 acres, while the total acreage designated not appropriate for timber production is decreased to 164,818 acres (from 191,871 acres). The net result of these changes is a 339–acre increase (to 234,864 acres) in the amount of land designated as unsuitable for timber production.

Amendment # 6, dated August 1988, changes the Land Classification table again. The amount of land designated not appropriate for timber production is increased to 174,163 acres (from 164,818 acres), thus causing a 9,345–acre increase (to 244,209 acres) in

---

**4.** The term "Management area" does not necessarily connote one physically contiguous area. Lands deemed to have the same "management objectives" are grouped into the same "management area" even though they may be in different parts of the Forest.

the amount of land designated as unsuitable for timber production.

Amendment #7, dated February 1990, changes the policy announcement on page III–6 of the Plan to read as follows:

Even-aged silvicultural systems will be applied to 90% of the suitable forest land on the Cherokee National Forest. Clearcut, seedtree and shelterwood regeneration methods will be used at the respective rates of 70%, 5%, and 15%. On the remaining 10%, uneven-aged management will be used, with group selection on 9% and single tree selection on 1%. The above suitable acres are all in Management Areas 14, 15, 16, 17, and part of 18. In MA 5, timber cutting may occur only for other than timber purposes.

Amendment #7 contains tables setting forth new, revised targets for allowable sale quantity of timber for the years 1986 through 1995. The allowable sale quantity of timber is reduced from 8.1 million cubic feet of timber to 6.4 million cubic feet annually.

Amendments #5, #12, #13, #21, and #24 make relatively minor changes to the distribution of acreage in management areas. None of the twenty-two amendments addresses the post–1989 absence of specific geographic sites for targeted timber sales in the action plan designated as Appendix C to the Plan.

In May 1991, the Service commenced a five-year review of the Plan, which led to the issuance of a document entitled "5–Year Review" ("Review"). Regarding timber sales, the Review states that the average amount of board feet of timber offered for sale annually in the period 1986–1990 was 33.8 million board feet ("MMBF"), 2% less than the 34.5 MMBF target set by the (amended) Plan. (Review at 2–9.) The Review also states that "[v]olume cut was 4.5 MCF." *Id.* Assuming

that "MCF" should be "MMCF," the average amount of timber *cut* annually in the period 1986–90 was almost 2 MMCF less than the 6.4 MMCF that was to be *offered* annually during the same period. Thus, according to the Review, only 70% of the timber offered for sale in the period 1986–90 was actually cut. The Record filed with the court does not appear to contain any information concerning actual timber harvests or timber sales after 1990.

Plaintiffs' complaint contains thirteen counts. Almost all of the counts argue that the Plan violates the NFMA or its regulations in some respect.[5] Basically, Plaintiffs' arguments break down into four categories: (1) the Plan designates too great a proportion of the Forest as suitable for timber harvesting; (2) the Plan sets targeted timber harvest levels which are too high; (3) the Plan inadequately protects the biological diversity of the Forest; and (4) the Plan inadequately protects the Forest's visual resources by designating too great a percentage of the land to categories allowing for modification of the natural terrain, *e.g.*, clear cuts and roads. In making these arguments, Plaintiffs do not attack the classification of any particular parcel of land, the clearing of any particular area, or any particular project.[6]

*Count I:* Plaintiffs assert that the Federal Defendants failed to designate, before establishing a timber harvest target level, what lands are physically unsuited for timber production. Plaintiffs also assert there are such physically unsuitable lands (even though the Plan expressly states that there are none), because the Federal Defendants erroneously found that technology is available which would allow timber harvesting without irreversible damage to soils productivity or watershed conditions. In support of these assertions, Plaintiffs rely on 16 U.S.C. § 1604(k)[7] and its attendant regulations:

---

**5.** The exceptions are Counts III, VI, and X. Count III argues that 36 C.F.R. § 219.14 (the "suitability regulation") violates the NFMA; Count VI argues that the Plan is inconsistent with the Department of Agriculture's own internal policies; and Count X argues that the Federal Defendants violated the settlement agreement by failing to propose a revised list of "Management Indicator Species" ("MIS").

**6.** The following discussion of Plaintiffs' arguments in support of their claims is drawn from the brief in support of their motion for summary judgment.

**7.** 16 U.S.C. § 1604(k) provides that
[i]n developing land management plans pursuant to this subchapter, the Secretary shall identify lands within the management area which

The suitability regulations provide for the review of physical suitability upfront, prior to the selection of harvest levels as required by section 6(k). The regulations provide that lands shall be identified as not suited for timber production on the basis of physical conditions if "technology is not available to ensure timber production for the land without irreversible resource damage to soils productivity, or watershed conditions." 36 C.F.R. § 219.14(a)(2) (1991). Moreover, to establish that technology is available, the Forest Service must identify the technology to be used in preventing irreversible damage and make provisions for its implementation in the Forest Plan.

.    .    .    .    .

Instead of evaluating the impacts of roads and cuts on slopes above 60 percent and other sensitive lands, the Cherokee planners avoided the required physical suitability analysis by categorically assuming that advanced logging technology was available and could be implemented on the Cherokee to avoid irreversible damage.

(Plaintiffs' Revised Mem. of Law in Supp. of Motion for Summ. Judg. ["Plaintiffs' Brief"] at 15, 19.)

*Count II:* Plaintiffs assert that the Federal Defendants (1) failed to designate, before establishing the harvest level, what lands are economically unsuited for timber production, (2) allowed the timber harvest target level to influence their designation of what lands are unsuited for timber production, and (3) included uneconomic lands in the timber base even though the government would lose money from timber harvesting on those lands. The first and second assertions appear to be two sides of the same coin. Regarding the first assertion, Plaintiffs reiterate their argument that 16 U.S.C. § 1604(k) and its attendant regulations mandate the economic unsuitability determination prior to the designation of the harvest level. Regarding the second assertion, Plaintiffs contend that even if uneconomic lands

are not designated prior to the establishment of the harvest level, the aforementioned statute and regulations do not allow the harvest level to influence the designation of uneconomic lands. Regarding the third assertion, Plaintiffs contend that 16 U.S.C. § 1604(k) "also requires that land not economically suited for timber production be excluded from the timber base." (Plaintiffs' Brief at 21.)

*Count III:* Plaintiffs assert that

the planning regulations on economic suitability are illegal to the extent that they (1) allow the Forest Service to ignore the economic character of the national forest land and (2) allow the suitable base to be dictated by harvest levels instead of by an objective evaluation of the economic character of the lands prior to, and independent of, the selection of harvest levels.

(Plaintiffs' Brief at 34.) In support of these assertions, Plaintiffs note that the suitability regulations establish a three-stage process for determining suitability. Their complaint is that "Stage II (Section 219.14(b)) ... requires a comparison of the direct costs of harvesting timber with the direct revenues. This exercise, however, does not (but should) result in lands being designated as unsuitable for timber production, regardless of how much money those lands would lose on timber production." *Id.*

*Count IV:* The Plan projects timber harvest target levels for six decades. Plaintiffs assert that the Federal Defendants "chose a harvest level for the fifth decade, 83 million board feet ("mmbf") that was nearly two and a half times current levels. This fifth decade harvest level and the sixth decade level of 102 mmbf required planners to include over 380,000 acres in the suitable base." (Plaintiffs' Brief at 29 [footnote omitted].) Plaintiffs argue that "a suitable base with less than 75,000 acres could produce more than enough timber for the Plan's first decade harvest level." *Id.* Assuming the suitability regulations are valid, Plaintiffs contend that

are not suited for timber production, considering physical, economic, and other pertinent factors to the extent feasible, as determined by the Secretary, and shall assure that, except for

salvage sales or sales necessitated to protect other multiple-use values, no timber harvesting shall occur on such lands for a period of 10 years.

allowing the fifth decade harvest level to dictate the timber base violates the economic suitability regulation. The ... regulation provides that only lands that are cost-efficient over the planning horizon in meeting *forest objectives,* which include timber production, should be included in the suitable timber base. 36 C.F.R. § 219.14(c) (1991). Only the first decade harvest level constitutes a "forest objective." Therefore, only those lands needed to meet the first decade harvest objective can be included in the suitable timber base under the regulations.

*Id.* at 37–38 (footnote omitted).

*Count V:* As noted above, the Stage II analysis compares the direct costs of harvesting timber with the direct revenues. "In the six years preceding the Plan the timber program lost over $2 million dollars each year.... The planners' own analysis showed that only 35,500 acres of the Forest would have timber revenues in excess of costs over the next fifty years and beyond." (Plaintiffs' Brief at 24 [citations omitted].) Plaintiffs assert that the Federal Defendants (1) failed to disclose to the public the results of the Stage II analysis and (2) "failed to disclose whether and, if so, how, they used the results of the Stage II analysis in the formulation of alternative harvest levels." *Id.* at 27. Plaintiffs argue that "[h]ad the decisionmakers been forced by the public to face up to the fact that the validity of the entire Plan depended on the planners' large projected price increases, the results would have been substantially different, and harvest levels would have been lower." *Id.* at 28.

*Count VI:* In July 1985, the Secretary of Agriculture issued a decision entitled "USDA Decision on Review of Administrative Decision by the Chief of the Forest Service Related to the Administrative Appeals of the Forest Plans and EISs for the San Juan National Forest and the Grand Mesa Uncompahgre, and Gunnison National Forest" (hereafter "*San Juan* decision"). Plaintiffs assert that under the *San Juan* decision, "when a forest plan proposes to expand an unprofitable timber sale program, the planning documents and Record of Decision must be rigorous in

explaining and justifying that *non-timber* benefits of the timber sale program in fact warrant its expansion and continuation." (Plaintiffs' Brief at 41 [emphasis in original].) Plaintiffs argue that the *San Juan* decision is binding administrative precedent that the Federal Defendants failed to follow when they promulgated the Plan.

*Count VII:* The Federal Defendants used a computer program called FORPLAN to assist them in promulgating the Plan. Plaintiffs assert that the assumptions the Federal Defendants made when they input data into the FORPLAN program were arbitrary and capricious: "First, they selected arbitrarily high harvest levels. Second, they assumed timber prices that were arbitrarily high. Finally, they failed to account for the costs of logging on steep slopes when much of the land in the suitable base has slopes greater than 40%." (Plaintiffs' Brief at 54.)

*Count VIII:* In this count, Plaintiffs assert that

[t]he Forest Service has failed to meet the requirements of 16 U.S.C. § 1604(g)(3)(B) and the NFMA regulations to provide for diversity of plant and animal communities and tree species, in the Cherokee as a whole, and in the cove hardwood community, in particular, and to provide for diversity at least as great as that which would be expected in a natural forest. By focusing on short-rotational, even-aged management, the Forest Service fails to allow the Forest to develop the structure and processes supporting the diversity inherent in natural forests....

... Furthermore, although the Forest Plan will result in a significant reduction in diversity in the Cherokee, the Forest Service has not shown that such reduction is needed to meet overall multiple-use objectives.

(Complaint, ¶¶ 99–100.)

Plaintiffs assert that "[a] forest's natural environment is composed of diversity at three biological levels: species, genetic, and ecological." (Plaintiffs' Brief at 64.) "Species" refers to trees and other plants, animals, and indeterminate organisms such as fungi and protozoa. *Id.* at 65. "Genetic"

refers to variations within a species. *Id.* "Ecological" refers to "differences in community types." *Id.* Plaintiffs further assert that

> [t]he cove hardwood forest community found in the Southern Appalachian Highlands represents the heart of this diversity. At maturity, a cove hardwood forest may contain dozens of hardwood tree species and hundreds of species of shrubs, ferns, flowers, and mosses.... Cove hardwood forests provide suitable habitat for a variety of animals ranging from black bears to salamanders and pileated woodpeckers. The cove hardwood community is among the most diverse of any ecosystem outside the tropics.

*Id.* at 61 (citations omitted).

Plaintiffs note that the NFMA directs the Federal Defendants to

> provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan.

16 U.S.C. § 1604(g)(3)(B). Plaintiffs assert that Congress passed this provision "to remedy the Forest Service's excessive emphasis on timber production at the expense of healthy forest ecosystems" and "to stop the wholesale conversion of mixed hardwood forests in the East to pine monocultures." (Plaintiffs' Brief at 62, 63.) Plaintiffs contend that § 1604(g)(3)(B), its legislative history, and the regulations promulgated under it "indicate[ ] that the diversity provision is intended to ensure that the Forest Service provide for and maintain the ecological integrity of our national forests.... To maintain the Forest as a healthy, functioning ecosystem, the Forest Service must provide for and maintain diversity at all biological levels." (Plaintiffs' Brief at 64.)

Plaintiffs note that the Federal Defendants do not agree the Service is required to "provide for and maintain diversity at all biologi-

cal levels." Instead, the Federal Defendants argue that only concerns over the large-scale conversion of forests from hardwoods to pine caused Congress to add a diversity provision to the NFMA. Plaintiffs disagree with this position, arguing that "[t]he diversity provision does more than simply focus on preserving existing diversity of tree species to discourage forest conversions and monocultures. The statute also directs the Forest Service to provide for diversity of 'plant and animal communities.'" *Id.* at 66.

Given Plaintiffs' interpretation of the NFMA's diversity provisions, it is not surprising that they dispute the Federal Defendants' statement that "the Plan [with its emphasis on even-aged logging] 'will provide a greater mix of stand age classes and stand structures than any of the other alternatives—therefore greater diversity within the Forest.'" *Id.* at 69 (quoting App.R. 26 [the Service's second ROD] at 5). Plaintiffs counter that the Service's approach causes "biological complexity [to] give[ ] way to simplicity as the Forest Service manipulates the complex natural environment to a homogeneous structure that resembles a tree farm rather than a forest. Clearcutting and other forms of even-aged logging simplify or homogenize the structure of a forest." *Id.* at 70. In support of their argument that clearcutting violates the NFMA's diversity provisions, Plaintiffs cite 16 U.S.C. § 1604(g)(3)(F)(v), which provides that

> clearcutting ... and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System lands only where—
>
> . . . . .
>
> such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource.

Plaintiffs make a number of arguments to support their position.

Plaintiffs attack the Federal Defendants' assertion that even-aged logging practices increase wildlife habitat by creating "early successional" conditions (i.e., the shrubs and thickets that arise after the clearcutting of a

parcel of land). Plaintiffs contend that (1) animals associated with old growth conditions are rare or endangered, while animals associated with early successional conditions are common; (2) "abundant browse and early successional habitat already exist in the Cherokee as a result of prior timber harvesting and natural disturbances," (Plaintiffs' Brief at 74); (3) natural forces, such as wind and fire, will lead to more early successional conditions; and (4) early successional conditions soon evolve into a condition where the land is suitable for few species, i.e., the land is too old for the early successional species and too young for old growth species.

Plaintiffs take particular exception to the Plan's identification of more than half of the acreage containing cove hardwoods being available and suitable for harvesting:

> The Forest Service has acknowledged that the cove hardwoods represent a distinct community and that cove hardwoods "are more diverse than many other forest communities." Responsive Statement at 25, App.R. 152. But the Forest Service did not account for the cove hardwoods' special ecological attributes in determining how many acres would be identified as unsuitable for timber harvesting or in providing for diversity in the Forest.

*Id.* at 78.

Plaintiffs contend that "the fragmentation of the Forest and the alteration of its natural condition to an even-aged structure will greatly reduce diversity in the Forest." *Id.* at 80. The main thrust of this contention appears to be that even-aged logging creates more forest "edge," even though "[l]arge, continuous, undisturbed tracts are necessary for the long-term stability of mature and old growth forest ecosystems." *Id.* at 81.

In summary, the court notes Plaintiffs' characterization of the Federal Defendants' position on even-aged logging as "a post hoc rationalization for [the Service's] timber harvesting program." *Id.* at 70. Plaintiffs argue that

> [t]he Forest Service has wrongfully rejected biological diversity as the guiding principle in forest management, in favor of a simplistic approach that focuses on achieving a checkerboard pattern of age classes

of trees distributed across the Forest. The Forest Service's view does not represent an objective examination of diversity; rather, "diversity" is defined by the Forest Service's even-aged timber harvesting methods.

*Id.* at 68. Plaintiffs thus contend that the Federal Defendants violated § 1604(g)(3)(B) by allowing the harvest level to influence their alleged duty to provide for diversity at all biological levels.

*Count IX:* Plaintiffs assert that the Federal Defendants failed to conduct certain inventories which the NFMA requires. Plaintiffs' argument is founded on two NFMA regulations. The first states that "[m]anagement prescriptions, where appropriate and to the extent practicable, shall preserve and enhance the diversity of plant and animal communities ... so that it is at least as great as that which would be expected in a natural forest." 36 C.F.R. § 219.27(g) (1993). The second states that "[i]nventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition." 36 C.F.R. 219.26 (1993).

Plaintiffs assert that "[t]he Forest Service failed to conduct any evaluation or inventory of diversity in terms of prior conditions, including the condition of a natural forest." (Plaintiffs' Brief at 86.) As a result, Plaintiffs assert that there is no diversity baseline for comparison purposes, and the Federal Defendants thus "cannot preserve and enhance diversity so that it is at least as great as that which would be expected in a natural forest." *Id.* Plaintiffs also complain that the Federal Defendants did not inventory the present diversity conditions in the Forest.

*Count X:* As explained below in footnote 15, Plaintiffs no longer seek any relief pursuant to Count X.

Counts XI through XIII each contend that the Plan violates the requirements of the NFMA by not protecting the Forest's visual resources.

*Count XI:* Plaintiffs note that the "maximum modification" category "allows large clearcuts and roads to dominate. Under maximum modification, 'vegetative and land-

form alterations'—that is[,] timber harvesting—'may dominate the landscape.'" (Plaintiffs' Brief at 93 [citation omitted].) The NFMA requires that clearcutting be used "only where ... such cuts are carried out in a manner consistent with the protection of ... esthetic resources." 16 U.S.C. § 1604(g)(3)(F)(v). Noting the statute's use of the words "only where," Plaintiffs argue that the maximum modification category "does not protect aesthetic resources, does not blend in with the natural terrain, and hence, quite glaringly, exceeds that which is permitted by statute." (Plaintiffs' Brief at 94 [footnote omitted].)

*Count XII:* Plaintiffs assert that the Plan's placement of 62% of the Forest into the "modification" and "maximum modification" categories represents a failure to protect the Forest's visual resources, which is a violation of 16 U.S.C. § 1604(g)(3)(F)(v). Moreover, Plaintiffs assert that the Federal Defendants failed to offer a rational basis or support for the 62% decision. Plaintiffs take particular exception to the Plan's statement that the Forest should have "'a managed look.'" (Plan at IV–67.)

*Count XIII:* An NFMA regulation provides that

> [t]he visual resource shall be inventoried and evaluated as an integrated part of evaluating alternatives in the forest planning process, addressing both the landscape's visual attractiveness and the public's visual expectation. Management prescriptions for definitive land areas of the forest shall include visual quality objectives.

36 C.F.R. § 219.21(f) (1993). Plaintiffs explain that the Service conducted a visual resource inventory and concluded that 60% of the Forest can be seen from roads, trails, or waterways. Accordingly, the Service stated that 40% of the Forest would be assigned a "Sensitivity Level" of 3, which is "generally a reference to the VQO categories of maximum modification and modification." (Plaintiffs' Brief at 98.)

Plaintiffs' complaint is that 62%, not 40%, of the Forest was placed in the maximum modification and modification categories, and that this increase occurred in the face of an "overwhelming number of public comments expressing concern for protecting the visual quality of the Cherokee and maintaining its natural beauty." *Id.* at 99. Given 36 C.F.R. § 219.21(f)'s direction regarding "the public's visual expectation," Plaintiffs argue that "the Forest Service's inventory and evaluation of visual resources did not comply with the NFMA regulations." (Plaintiffs' Brief at 99 [footnote omitted].)

Were they to prevail, Plaintiffs seek the following specific relief:

(1) a declaratory judgment that the Plan/FEIS and the decisions implementing and upholding them are "arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law, as set forth in the [Administrative Procedure Act], 5 U.S.C. § 706(2)" (Complaint at 38–39);

(2) a declaratory judgment that the suitability regulations violate the NFMA;

(3) a remand of the Plan/FEIS and the decisions implementing and upholding them with directions that Defendants make the Plan/FEIS comply with the NFMA;

(4) an order directing Defendants to circulate for public review and comment the revised Plan/FEIS;

(5) an order directing Defendants to "identify in the re-analysis and reformulation of the Forest Plan all lands that are physically or economically not suited for timber production, independent of the selection of timber harvest levels; exclude those lands from timber harvesting for at least ten years; revise the suitability regulations, 36 C.F.R. § 219.14 (1991), to require an objective economic suitability determination based on a rule of reason that will be made independently of the selection of timber harvest levels; fully comply with the Secretary of Agriculture's *San Juan* decision; undertake a thorough economic analysis of the timber program that accurately considers all factors determining revenues and costs of timber harvesting including roads; discuss this economic analysis in the documents circulated to the public; use the results of the economic analysis in deter-

mining unsuitable lands and in setting harvest levels and other objectives of the Forest Plan; in the alternative, if harvest levels are allowed to influence the suitable base, permit only first decade harvest levels to be considered; and remedy the other illegalities and flaws regarding the suitability analysis identified in this Complaint" (Complaint at 39–40);

(6) an order directing Defendants to "provide for and maintain the biological diversity of the Cherokee as a whole, and the cove hardwood community in particular, by considering the ecological characteristics and natural cycle of the Forest and by allowing the Forest to develop the structure and processes supporting the diversity inherent in natural forests; eliminate the use of age class distribution as a measure of diversity; inventory and evaluate diversity in terms of· present and prior conditions; and remedy the other illegalities and flaws concerning diversity identified in this Complaint" (*id.* at 40);

(7) a declaratory judgment that Defendants are in breach of the settlement agreement due to their alleged failure to propose a revised MIS list, as well as an order directing Defendants "to prepare a new list of management indicator species forthwith that will be subject to public review and comment" (*id.*);

(8) an order directing Defendants to "eliminate the use of the Maximum Modification visual quality objective on the basis that it is a *per se* violation of· the NFMA requirement to protect the visual resources of the national forests; inventory the Forest's visual resources; and redesignate the Cherokee Forest, using visual quality objectives that adequately protect the Forest's visual resources and that are based on sound and documented public expectations and the visual attractiveness of the landscape; and remedy the other illegalities and flaws re-

garding visual quality identified in this Complaint" (*id.* at 40–41).[8]

Defendants dispute each of Plaintiffs' claims and contend that neither the Plan nor the methods used to prepare it violated the NFMA or any other law or regulation. Defendants also contend that because of the nature of the Plan, Plaintiffs lack standing to assert the claims set forth in the complaint, and that the claims are not ripe for resolution. Defendants ask that Plaintiffs' claims be dismissed, or alternatively, that summary judgment be granted in their favor.

The court first turns to the Federal Defendants' contentions that Plaintiffs have no standing to bring this action and Plaintiffs' claims are not ripe for judicial review. The court finds these two arguments to be meritorious, with the result that Plaintiffs' claims must be dismissed.

## STANDING

In *Lujan v. Defenders of Wildlife*, 504 U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("*Defenders* "), the Supreme Court set forth the essential elements of standing analysis for purposes of the Constitution's "case or controversy" requirement:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized ... and (b) "actual or imminent, not 'conjectural' or 'hypothetical' ".... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." ... Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Defenders*, 504 U.S. at ——, 112 S.Ct. at 2136, 119 L.Ed.2d at 364 (citations omitted).[9]

---

**8.** Plaintiffs also seek "their costs, disbursements, and attorney's fees." (Complaint at 41.)

**9.** In their brief, Plaintiffs characterize the foregoing elements as "prudential" considerations. (Plaintiffs' Mem. in Opp. to Federal Defendants' Cross Motion for Summ. Judg., etc. ["Plaintiffs'

Response"] at 4 n. 4.) However, the Supreme Court clearly stated that the three standing elements it identified represent "the irreducible *constitutional* minimum of standing." *Defenders*, 504 U.S. at ——, 112 S.Ct. at 2136, 119 L.Ed.2d at 364 (emphasis added).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* Based on the discussion that follows, the court finds that Plaintiffs have failed to show injury in fact.

■ The Federal Defendants argue that Plaintiffs cannot show actual or imminent injury in fact because

> the Plan simply establishes parameters for activity on the forest for a ten to fifteen year period, until the plan is revised. *See* 36 C.F.R. § 219.10(g). The Plan does not dictate any specific action to be taken which would alter the forest environment. Any alleged "injury" of which plaintiffs complain would occur only as site-specific projects are implemented. Hence, at this stage in the process, there is no imminent injury in fact.

(Federal Defendants' Brief at 13.) The Timber Intervenors amplify this argument as follows:

> Adoption of a paper plan does not change the on-the-ground environment or dictate that any particular site-specific action causing an environmental injury must occur. Instead, environmental injury would result only if: (1) a site-specific action (*e.g.,* a timber sale) is later proposed consistent with the plan or pursuant to a plan amendment; (2) the site-specific action is subjected to NEPA and NFMA analysis, and public review; (3) the Forest Service adopts the site-specific action: and (4) no one challenges that action and obtains injunctive relief.

(Timber Intervenors' Brief in Supp. of The Government's Motion for Summ. Judg. and in Opp. to Plaintiffs' Cross–Motion ["Timber Intervenors' Brief"] at 21.)

Plaintiffs offer two rationales for a finding that they have suffered injury in fact. The first rationale turns on the notion of "procedural injury," as exemplified in *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1516–1517 (9th Cir.1992) ("*Mumma* "). In *Mumma,* a conservation group challenged, as a violation of the NEPA and the NFMA, the Service's decision to recommend that forty-three of forty-seven roadless areas in the Idaho Panhandle National Forest not be designated as "wilderness" areas. *Id.,* 956 F.2d at 1510. There, as here, the Service argued that there was no actual or imminent injury because of the absence of site-specific decisions.

The Ninth Circuit anchored its finding of personal injury on the proposition that injury in fact for standing purposes arises from an agency's alleged failure to follow proper procedures in rendering a decision of general application. *Id.* at 1514 ("[B]ecause 'NEPA is essentially a procedural statute designed to ensure that environmental issues are given proper consideration in the decisionmaking process,' injury alleged to have occurred as a result of violating this procedural right confers standing.") (citation omitted). The Ninth Circuit then proceeded to reject the defendants' claims that the plaintiffs lacked standing because the challenged action was too remote and because the plaintiffs had not shown an impact on their personal interests.[10]

The Supreme Court's opinion in *Defenders* expressly invalidates the notion that standing can arise from an alleged procedural injury. In *Defenders,* the Supreme Court addressed a provision of the Endangered Species Act ("ESA") (called the "citizen-suit" provision) that purports to allow "any person" to sue the United States or one of its agencies for an alleged violation of the ESA. *Defenders,* 504 U.S. at ——, 112 S.Ct. at 2142–43, 119 L.Ed.2d at 371. The lower court had viewed this statute as authorizing standing based on the notion of procedural injury:

> The court [below] held that, because § 7(a)(2) [of the ESA] requires interagency consultation, the citizen-suit provision creates a "procedural right[ ]" to consultation in all "persons"—so that *anyone* can file suit in federal court to challenge

10. *Mumma's* ruling on the remoteness issue is discussed below. As for the personal interest issue, there appears to be no dispute in this case, based on the affidavits Plaintiffs have filed, that many of Plaintiffs' members have visited the Forest, intend to visit it in the future, and perceive that Defendants' actions will harm their enjoyment of the Forest. Whether this perception of harm is legally sufficient for standing purposes is discussed in conjunction with the remoteness issue.

> the Secretary's (or presumably any other official's) failure to follow the assertedly correct consultative procedure, notwithstanding their inability to allege any discrete injury flowing from that failure.

*Defenders,* 504 U.S. at ——, 112 S.Ct. at 2142, 119 L.Ed.2d at 371 (emphasis in original) (quoting *Defenders of Wildlife, Friends of Animals & Their Environment v. Lujan,* 911 F.2d 117, 121 (8th Cir.1990)). The Supreme Court strongly rejected this notion: "[T]he court [below] held that the injury-in-fact requirement had been satisfied by congressional conferral upon *all* persons of an abstract, self-contained, noninstrumental "right" to have the Executive observe the procedures required by law. We reject this view." *Defenders,* 504 U.S. at ——, 112 S.Ct. at 2143, 119 L.Ed.2d at 372 (footnote omitted).[11] Thus, the court finds that *Mumma's* theory of procedural injury is invalid and of no help to Plaintiffs' contention that they have suffered injury in fact.

Plaintiffs' other rationale for injury in fact is that the Plan without more does threaten them with actual or imminent injury because it sets the parameters for future decisions as to specific timber sales or the development of particular sites. In *Mumma* the Ninth Circuit agreed with this argument:

> [W]hether or not it is irrevocable, the Service's decision is harmful for standing purposes....
>
> ... [I]f the agency action only could be challenged at the site-specific development stage, the underlying programmatic authorization would forever escape review. To the extent that the plan predetermines the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge. That point is now, or it is never.

*Mumma,* 956 F.2d at 1516 (footnote omitted). Plaintiffs also rely on *Sierra Club v. Robertson,* 764 F.Supp. 546 (W.D.Ark.1991), *rev'd,* 28 F.3d 753 (8th Cir.1994). Though it predates *Mumma,* the district court's opinion in *Robertson* foreshadowed *Mumma's* reasoning; in rejecting the site-specific argument, the *Robertson* district court held that "[t]hough the Forest Service argues that it may in fact alter the plan after it is adopted, and not utilize the harvesting patterns or techniques recommended by the plan, such an ability should not work to insulate all of its decisions from judicial review." *Id.,* 764 F.Supp. at 554.[12]

The Federal Defendants and the Timber Intervenors on the other hand rely on *Sierra Club v. Robertson,* 28 F.3d 753 (8th Cir.1994), the Eighth Circuit decision reversing the *Robertson* district court case upon which Plaintiffs rely. In *Robertson,* the Eighth Circuit found that plaintiffs had no standing:

11. The Supreme Court stated it had

> consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.

*Defenders,* 504 U.S. at ——, 112 S.Ct. at 2143, 119 L.Ed.2d at 372. In *Region 8 Forest Serv. Timber Purchasers Council v. Alcock,* 993 F.2d 800, 810–11 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 683, 126 L.Ed.2d 651 (1994), the Eleventh Circuit followed *Defenders* and rejected the argument of several timber industry groups that they had standing to challenge a decision of the Service because of alleged procedural injury.

12. Plaintiffs cite two additional cases in support of their attack on the site-specific argument: *Seattle Audubon Society v. Moseley,* 798 F.Supp. 1484 (W.D.Wash.1992) ("Moseley"), and *Seattle Audubon Society v. Espy,* 998 F.2d 699 (9th Cir. 1993) ("*Espy*"). In *Moseley,* the plaintiffs challenged a FEIS and ROD regarding "revised standards and guidelines to ensure the viability of the northern spotted owl in national forests." *Id.,* 798 F.Supp. at 1487. The *Moseley* court first noted *Defenders'* statement of the minimum requirements for standing. The court next quoted from affidavits by a few of the plaintiffs' members which essentially showed that the members had visited the forests at issue in the past and planned to visit them in the future. The court then found the existence of standing because "[t]he threatened injury to plaintiffs from further logging of old growth habitat for the spotted owl is concrete, specific, imminent, caused by the agency conduct in question, and redressable by a favorable ruling." *Moseley,* 798 F.Supp. at 1488. *Espy* was the decision of the Ninth Circuit on the defendants' appeal in *Moseley;* the Ninth Circuit simply tracked its reasoning in *Mumma* on the remoteness issue to affirm the district court's finding of standing.

The mere existence of the Ouachita Forest Plan does not produce an imminent injury in fact. A forest plan ... is a general planning tool. It provides guidelines and approved methods by which forest management decisions are to be made for a period of ten to fifteen years. Adoption of the Plan does not effectuate any on-the-ground environmental changes. Nor does it dictate that any particular site-specific action causing environmental injury must occur. Indeed, before an environmental change can come about, several events must transpire. [Here the Court recites the steps that must occur before a site-specific plan is approved; *see* Timber Intervenors' Brief, *supra.*] Finding an environmental injury based on the Plan alone, without reference to a particular site-specific action, would "take[ ] us into the area of speculation and conjecture." *O'Shea v. Littleton,* 414 U.S. 488, 497 [94 S.Ct. 669, 676, 38 L.Ed.2d 674] ... (1974).

*Robertson,* 28 F.3d at 758.

The Eighth Circuit noted that the Supreme Court has not directly addressed the standing issue in the context of a challenge to a land and resource management plan. *Id.* However, the Eighth Circuit also noted the Supreme Court's insistence " 'that the injury proceed with a high degree of immediacy,' *Defenders,* [504 U.S. at —— n. 2, 112 S.Ct. at 2138 n. 2, 119 L.Ed.2d at 367 n. 2], in order to avoid deciding a case in which no injury will occur." *Robertson,* 28 F.3d at 758. The *Robertson* court used the Supreme Court's opinion in *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("*NWF*"), to illustrate this point:

In *NWF*, environmental groups sought judicial review of the "program" by which the Bureau of Land Management classifies and administers public lands. The Court held that the plaintiffs did not have standing to challenge the program wholesale. In addition, the Court advised that even the individual classifications of public land by the BLM might not be sufficiently developed for judicial review. The Court stated that "the individual [classifications] of the BLM ... can be regarded as rules

of general applicability (a 'rule' is defined in the APA as agency action of 'general or particular applicability *and future effect,*' 5 U.S.C. § 551(4) (emphasis added)) announcing, with respect to vast expanses of territory that they cover, the agency's intent to grant requisite permission for certain activities, to decline to interfere with other activities, and to take other particular action if requested. It may well be, then, that even those individual actions will not be ripe for challenge until some further agency action or inaction more immediately harming the plaintiff occurs." *NWF,* 497 U.S. at 892, 110 S.Ct. at 3190. The classifications discussed in NWF are analogous to the Ouachita Forest Plan, and the Court's language bolsters our conclusion that the appellants lack standing to challenge the Plan except in the context of a proposed site-specific action.

*Robertson,* 28 F.3d at 758–59.

There is no Eleventh Circuit case addressing the issue of standing with respect to a general attack on a land and resource management plan for a national forest. The court finds the Eighth Circuit's opinion in *Robertson* to be more persuasive than that of the Ninth Circuit in *Mumma* and accordingly will adopt the Eighth Circuit's decision finding a lack of standing in a case such as the instant one.

■ Plaintiffs correctly point out that the decision of the Chief of the Service adopting the Plan in the face of their objections is a "final agency action" under the APA. Also, Plaintiffs are correct that the Plan sets parameters for future timber sales and future development of the Forest. However, final agency action does not necessarily confer standing and the Plan is quite general in nature, contains projections far into the future, and, as is demonstrated by the record herein, is subject to piecemeal change and periodic revision. Also, the court's determination that Plaintiffs lack standing at this time to assert the claims made herein is *ipso facto* a determination that at such time as the Plan is implemented in a specific way, it will not be too late to complain. Should Plaintiffs find that a particular proposed development in the Forest under the Plan is objectionable,

there would be no impediment to judicial review at that time.

■ Plaintiffs' argument ignores the fact that while administrative agencies exercise quasi-judicial powers, they are not limited by the "case or controversy" requirement of Article III of the Constitution. *Ecee, Inc. v. Federal Energy Regulatory Comm'n,* 645 F.2d 339, 349 (5th Cir.1981).[13] Consequently, administrative agencies may hear and decide disputes of a broad nature that would not be eligible for judicial review. *Id.* ("[W]ithin their legislative mandates, agencies are free to hear actions brought by parties who might be without standing if the same issues happened to be before a federal court."). On the other hand, the "case or controversy" requirement is an express constitutional limitation on the activities of all Article III courts. *Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 471, 102 S.Ct. 752, 757–58, 70 L.Ed.2d 700 (1982). It is beyond dispute that the courts, not the Congress or the executive branch, have retained (as they must) the authority to decide whether the standing component of the "case or controversy" requirement is satisfied. *See Defenders, passim.*[14] Thus, while a court may inquire about and be informed by the administrative proceedings that have occurred prior to the filing of an action, those proceedings are certainly not decisive on the issue of whether or not a litigant has standing to bring his dispute before the court.

In summary, Plaintiffs cannot show injury in fact solely on an assertion that the Federal Defendants violated the NFMA and/or its regulations. The other ground for a finding of standing turns on whether the Plan without more creates actual or imminently-threatened injury to Plaintiffs. The court

finds that it does not. Accordingly, Plaintiffs have failed to carry their burden of showing that they have standing to bring this action.

### RIPENESS

■ The standing issue aside, the Federal Defendants argue that this action should be dismissed because the issues presented are not ripe for judicial review.

> [I]t is fair to say that [the ripeness doctrine's] basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

"[B]oth standing and ripeness analyses look to the existence of actual injury to the plaintiff caused by the alleged wrong...." *Hallandale Prof. Fire Fighters Local 2238 v. City of Hallandale,* 922 F.2d 756, 760 n. 3 (11th Cir.1991); *cf. Abbott Labs.,* 387 U.S. at 152, 87 S.Ct. at 1517 ("[T]he impact of the regulations upon the petitioners is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage."). Thus, Plaintiffs' claims are not ripe for the same reason that they lack standing.

The court also is persuaded that Plaintiffs' claims are not ripe because dismissal of this action will cause little or no hardship to Plaintiffs. "An assessment of hardship often

---

13. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit handed down prior to October 1, 1981.

14. In *Defenders,* the Supreme Court expressly announced the judiciary's supremacy on this issue. As discussed earlier, the Court unequivocally rejected the notion of a "citizen-suit," i.e., the notion that Congress can enact a law which confers standing on any person to sue over the

alleged violation of a procedural law. *Id.,* 504 U.S. at ———, 112 S.Ct. at 2142–43, 119 L.Ed.2d at 371–72; *cf. id.* at ———, 112 S.Ct. at 2147, 119 L.Ed.2d at 377 (Kennedy, J., concurring) ("[I]t would exceed [the] limitations [that Article III places on courts] if, at the behest of Congress and in the absence of any showing of concrete injury, we were to entertain citizen-suits to vindicate the public's non-concrete interest in the proper administration of the laws.").

turns on a straight-forward prediction of the course events are likely to take." 13A Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* § 3532.3 at 159 (1984). First, though Plaintiffs filed this action almost 2½ years ago, they have not sought leave to amend their complaint to challenge any specific timber sales. This fact tends to indicate that the Federal Defendants, being aware of Plaintiffs' concerns, have refrained from proposing timber sales in areas of the Forest which Plaintiffs consider to be sensitive.

Second, the Federal Defendants contend that "Plaintiffs' arguments regarding suitability will become moot in the near future because the NFMA requires a new suitability determination be made every ten years. 16 U.S.C. § 1604(k). In this case, the Forest Service must undertake a new suitability analysis in 1996." (Federal Defendants' Brief at 26 n. 6.) Since a new administrative planning cycle is imminent, if not already begun, the court cannot help but note that the administration now in power may be more receptive to Plaintiffs' vision of the uses to which the National Forests should be put.

Third, it cannot be disputed that in this and other cases Plaintiffs have demonstrated an indefatigable determination in their efforts to advance their vision of how the Forest should be utilized. This determination may have been a catalyst in the settlement of a number of the disputes that arose from the adoption of the Plan in 1986. The seeming absence of objectionable timber sale proposals is also evidence of this determination. Finally, the court does not doubt that Plaintiffs will carry this determination into the next administrative planning round.

Fourth, to the extent that Plaintiffs do suffer some hardship, the court believes it will be justified.

> The value of not deciding [an issue] is affected by the relationships of the federal judiciary with other branches of the federal government and with state institutions, the need to conserve judicial resources, and the risk that premature decision may be proved unwise as facts are more fully developed and as more minds consider the question.

13A Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *supra* § 3523.3 at 146–47. The issues here are decidedly complex and do not readily lend themselves to judicial resolution by "generalist" federal courts. *Batanic v. INS,* 12 F.3d 662, 665 (7th Cir. 1993) ("The agency, when interpreting a statute which it administers in an area in which it has expertise, is better able to evaluate and weigh the competing policy interests in that field than is a generalist federal court.") (footnote omitted). Moreover, the nearness of a new administrative planning cycle, the possibility that new facts will be developed during the cycle, and the fact that "more minds," perhaps with different outlooks, will be involved in the cycle convince the court that it should defer a decision on Plaintiffs' claims.[15]

## REMAINING MOTIONS

The motion of State of Tennessee Wildlife Resources Agency and International Association of Fish and Wildlife Agencies for leave to file amici curiae brief, Plaintiffs' notice of objection and motion to strike, and the Timber Intervenors' two motions to supplement briefing all pertain to the merits of this action. Therefore, all of the foregoing motions are dismissed as moot, since the court does not reach the merits given Plaintiffs' lack of standing. The Federal Defendants' motion to supplement briefing is granted, since that motion introduces the Eighth Circuit's decision in *Robertson.* Plaintiffs' motion for oral argument is denied.

## CONCLUSION

Accordingly, Count X of Plaintiffs' complaint [# 1–1] is DISMISSED as moot. The

---

**15.** The one exception to the court's reasoning on the standing and ripeness issues concerns Plaintiffs' claim that the Federal Defendants violated the settlement agreement vis-a-vis issuing a revised MIS list. Based on the foregoing analysis of standing and ripeness, the court finds that this claim is properly before it. However, in their reply Plaintiffs concede that they have received a favorable ruling on their administrative appeal of the MIS issue. Plaintiffs thus state that they "are not seeking further relief on this issue." (Plaintiffs' Response at 107.) The claim is therefore dismissed as moot.

Federal Defendants' motion for summary judgment [# 38–1] is GRANTED on the standing issue with regard to Counts I–IX and XI–XIII of Plaintiffs' complaint. Counts I–IX and XI–XIII of Plaintiffs' complaint are DISMISSED WITHOUT PREJUDICE. The balance of the Federal Defendants' motion for summary judgment is DISMISSED AS MOOT. Plaintiffs' revised motion for summary judgment [# 36–1] is DISMISSED AS MOOT. The motion of State of Tennessee Wildlife Resources Agency and International Association of Fish and Wildlife Agencies for leave to file amici curiae brief [# 40–1], Plaintiffs' notice of objection and motion to strike [# 41–1], and the Timber Intervenors' two motions to supplement briefing [# 50–1 and # 52–1] are DISMISSED AS MOOT. The Federal Defendants' motion to supplement briefing [# 55–1] is GRANTED. Plaintiffs' motion for oral argument on summary judgment motion [# 58–1] is DENIED.

SO ORDERED.